IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

MICHAEL SCHULTZ, JOHN SCALA, HUUB VAN
ROOSMALEN, KIP KIRCHER, ROBERT H. WAKE and
LOUIS SPANBERGER, On Behalf of Themselves and All
Others Similarly Situated,

                Plaintiffs,

      v.

TOMOTHERAPY INCORPORATED, FREDERICK A.
ROBERTSON,  T. ROCKWELL MACKIE,
STEPHEN C. HATHAWAY,  PAUL RECKWERDT,
MICHAEL J. CUDAHY,  JOHN J. MCDONOUGH,
 JOHN NEIS, CARY C. NOLAN, CARLOS A. PEREZ,
M.D., SAM R. LENO, and FRANCES S. TAYLOR,

                Defendants.

OPINION AND ORDER

08-cv-314-slc

08-cv-342-slc

---

In this proposed shareholder class action,[1] plaintiffs allege that defendant TomoTherapy

and its officers and directors violated the Securities Act of 1933 and the Securities Exchange Act

of 1934.  Now before the court is defendants' motion to dismiss plaintiffs' claims pursuant to

Fed. R. Civ. P. 12(b)(6) and 9(b).  For the reasons stated below, I am granting defendants'

motion to dismiss in part.  I am granting the motion with respect to plaintiffs' claim that

defendants violated the 1933 Act by suggesting in public offering prospectuses that a "majority"

or "significant majority" of the company's backlog would convert to revenue in 9-12 months.

However, I am denying the motion with respect to plaintiffs' claim that defendants violated the

---

[1]  This case was originally filed as two cases, Nos. 08-cv-314-slc and 08-cv-342-slc.  After I granted
a motion filed by the plaintiffs in those cases to consolidate the cases, appoint counsel and lead plaintiffs
Michael Schultz, John Scala, Huub Van Roosmalen and Kip Kircher and identify Robert H. Wake and
Louis Spanberger as "additional" plaintiffs, dkt. 13, the plaintiffs filed a corrected consolidated amended
complaint under Case No. 08-cv-314-slc, dkt. 26.  Although plaintiffs do not identify all the lead plaintiffs
and additional plaintiffs in the caption of the complaint (naming only Michael Schultz), this appears to
be an oversight.  I have amended the caption to reflect the proper parties identified in the corrected
consolidated complaint.  As a housekeeping matter, we will keep both case numbers in the case caption,
but only the "314" case is active.

1933 Act by suggesting in the prospectuses that TomoTherapy's backlog contained only "firm" or non-contingent orders.  Although I am granting defendants' motion to dismiss in many respects, it will not be with prejudice as defendants have requested.  Instead, those claims will be dismissed without prejudice to plaintiffs' filing a second amended complaint to comply with Rule 8 (as to plaintiff's 1933 Act claim) and with the PSLRA and Fed. R. Civ. P. 9(b) (as to plaintiff's 1934 Act claim).

From plaintiffs' complaint, and certain documents incorporated by reference, I draw the following allegations of fact. (The full text of the SEC filings, prospectuses and analysts' reports referenced in the complaint are properly considered in deciding defendants' motion to dismiss, *cf. Venture Associates Corp. v. Zenith Data Systems Corp.*, 987 F.2d 429, 431 (7th Cir. 1993) (documents outside pleadings may be considered if referenced in complaint, central to plaintiffs' claim and attached to defendants' motion to dismiss)).

ALLEGATIONS OF FACT

**I. Parties**

Defendant Tomotherapy Incorporated was founded in 1997.  The company develops, manufactures, and sells an advanced radiation therapy system known as the Hi-Art system.

The remaining defendants are directors and officers of defendant TomoTherapy: Frederick A. Robertson is the Chief Executive Officer; Stephen C. Hathaway is the Chief Financial Officer; T. Rockwell Mackie is a co-founder of TomoTherapy and the Chairman of the Board of Directors, Paul Reckwerdt is a cofounder of TomoTherapy, a director and President; Michael J. Cudahy, John J. McDonough, John Neis, Cary J. Nolan, Carlos A. Perez, Sam R. Leno and Frances S. Taylor are directors.

## II.  TomoTherapy's Business

TomoTherapy sells a single product, the Hi-Art system.  The Hi-Art system delivers radiation with submillimeter accuracy to kill cancer cells while reducing radiation exposure to surrounding healthy tissue.  The Hi-Art is a large, capital-intensive piece of equipment that typically faces a long sales cycle, often longer than 12 months.  It can be a year or more between the time of customer contact and execution of a purchase order.  To house the system, each customer must prepare a space known as a "bunker."

TomoTherapy does not recognize revenue at the time an order is placed for a Hi-Art system. In accordance with its policies, TomoTherapy recognizes revenue on sales of the Hi-Art system when four specific criteria are met:  (1) persuasive evidence of an arrangement exists; (2) title and risk of loss have been transferred to the customer; (3) the sales price is fixed or determinable; and (4) collection is reasonably assured.  After an order is placed but before it is recognized as revenue, it may be counted as part of the company's "backlog," a metric used for determining future revenue.

After the Hi-Art system was introduced commercially in 2003, the company established an install base of 125 Hi-Art systems worldwide between 2003 and May 2007.  Throughout 2006, TomoTherapy marketed the High-Art system almost exclusively to non-profit institutions, which usually ordered just one High-Art system each.

### III. The 21ˢᵗ Century Order and Defendants' New Strategy

At the end of 2006, defendants launched a sales strategy for "selective targeting" of for-profit entities.  These entities would "often place orders for multiple Hi-Art treatment systems and then install the units sequentially, not all at once" which could "cause some of these multi-unit orders to remain in backlog longer than single system orders."  During the second quarter of fiscal year 2007, the period ending June 30, 2007, defendant TomoTherapy announced that a for-profit company named 21ˢᵗ Century had placed a multi-unit order for its Hi-Art system.  On August 1, 2007, defendant Robertson stated that the company was "focused on expanding our presence in" the growing for-profit segment of the U.S. market and defendant Hathaway stated that the order to 21st Century "represents new opportunity for us" and that "we continue to target the for-profits."  In October 2007, the vice president of global sales for defendant TomoTherapy stated that the company had increased its national accounts focus so that it was now "actively involved and engaged in all of the rapidly growing for-profit institutions" along with its usual non-profit accounts.

One analyst noted that the 21ˢᵗ Century order added "upward of $17 million to the company's backlog in the third quarter and should translate into recognized revenue within the next twelve months."  Defendants "had a lot of success" in obtaining multi-unit orders from for-profit entities; in April 2008, defendant Hathaway stated that "we essentially went from no orders in our backlog for multiunit centers a year ago to about a third of our backlog [being] orders from these multiunit centers at this point in time."  At the same time, the number of multi-unit orders "had an impact" on the delivery dates of orders.  As defendant Robertson explained in April 2008, for-profit entities tended to "place orders for multiple Hi-Art treatment

systems and then install the units sequentially.  This process causes some of these multi-unit orders to remain in backlog longer than single-system orders."

## IV. The Sagemark Orders

On November 29, 2006, a company named Sagemark placed an order for three Hi-Art systems, one for a cancer treatment center in which Sagemark was finalizing a lease and two others for sites still under consideration in which Sagemark was still in discussion with potential partners and other financing sources to fund the centers.  At the time, Sagemark was uncertain whether it could receive financing for the orders.  Sagemark's Chief Executive Officer sent an email to Ed Douglas, a representative of defendant Tomotherapy, confirming that Sagemark had signed the orders and sent $50,000 down payments for each order but that Sagemark would "rely upon your assurance that TomoTherapy Incorporated understands and agrees that Sagemark's obligations under the purchase orders are contingent upon Sagemark obtaining financing" and that if Sagemark did not receive proper financing, "Sagemark will have the right to terminate the purchase orders and TomoTherapy Incorporated will return the deposits in full."

Defendant TomoTherapy had "Standard Terms and Conditions of Sale," which provided that "[i]n the event of Buyer's unauthorized cancellation, termination, or default . . . TomoTherapy shall retain 25% of all down payments as liquidated damages."[2]  In addition, the Standard Terms and Conditions of Sale provided that "[t]hese Terms may **not** be altered,

---

[2]  These "Standard Terms and Conditions of Sale" were included in the first registration statement filed with the SEC as part of the company's Initial Public Offering.

supplemented, or amended by the use of any other document(s), and TomoTherapy has not authorized any employee or agent to offer any terms, conditions, or any other rights whatsoever except as provided herein." The terms could be varied only if "specifically accepted in writing by the Chief Executive Officer of TomoTherapy." Despite these terms, Ed Douglas responded to Sagemark's email requesting special contingency provisions by confirming that if Sagemark could not obtain financing for one of the systems, "we will void your contract and return the deposit or if you prefer, apply the deposit to another agreement."

On April 2, 2007, Sagemark made public its unstable financial situation, stating that "[o]ur current working capital and cash flow from operations will not be sufficient, without additional financing, for us to meet certain of our near term business plans and to pay our monthly operating expenses . . .." On May 9, 2007, the day that TomoTherapy conducted an Initial Public Offering, Tomotherapy announced that it had entered into a new project with Sagemark Companies to use the Hi-Art system in planned treatment centers and Sagemark stated that it had placed three orders for Hi-Art systems. Sagemark's three orders were included in defendant's backlog. This backlog was reported in defendant TomoTherapy's Initial Public Offering, as explained below.

Immediately prior to the end of the second quarter of 2007, TomoTherapy officials called Sagemark and asked it to order three additional systems. Sagemark agreed to place these orders if there was no down payment required and they were contingent on obtaining financing. On June 28, 2007, Ed Douglas sent an email to other TomoTherapy officials stating that a contingency clause could not be included in the contract with Sagemark because "if the . . . clause is on the contract we cannot book the orders this quarter, which is the ultimate purpose

for expediting . . . signing." However, Douglas pointed out that for the November 2006 order, "[i]f I recall correctly, I gave them my word on this and that sufficed" and asking if "all" would "be comfortable with a letter from [my] director" agreeing to the contingency as a "side bar to the contract." That same day, Jeff Spielman, defendant TomoTherapy's Director of U.S. Sales, Northern Region, sent such a "side letter" to Sagemark officials, confirming the order and stating that the orders were "expressly subject and conditioned upon" Sagemark's obtaining financing. Unlike the November 2006 orders, there was no press release accompanying Sagemark's placement of these orders. On August 14, 2007, Sagemark revealed its deepening insolvency and stated that there was "substantial doubt about [their] ability to continue as a going concern." Sagemark's three additional orders were placed into the backlog as of June 30, 2007; they remained in the backlog with the other Sagemark orders until three of the orders were removed in the first quarter of 2008.

## V. The Offerings

### A. The Initial Public Offering

Defendants conducted an Initial Public Offering (IPO) of TomoTherapy's stock on May 9, 2007, offering 11,743,420 shares of the company's stock to the public at a price of $19 a share. In connection with the IPO, the company issued a registration statement (with multiple amendments) and an offering prospectus.

The IPO prospectus included several statements about the company's "backlog," which was defined as "the total contractual value of all firm orders received for Hi-Art system, and optional related products. Such orders must be evidenced by a signed quotation or purchase

7

order from the customer, including the required down payment, if any."  The prospectus

described the backlog as a "general indicator of the revenue expected to be recognized over the

next year, when combined with the new sales contracts entered into early in the year."  The

reason provided for using the backlog as a "general indicator" of future revenue was as follows:

> We believe that our backlog levels provide a better measure at any
> particular point in time of the long-term performance prospects of
> our business. A significant portion of our revenue each quarter is
> derived from our backlog.  The level of backlog will fluctuate based
> on our customers' ordering patterns and the timing of the
> completion of the acceptance test procedures necessary for revenue
> recognition. However, the majority of our backlog has historically
> been converted to revenue within twelve months of order
> placement.

In addition, the IPO prospectus made certain estimates regarding present backlog figures, stating

that "[a]s of December 31, 2006, we had . . . a backlog of $164 million, the significant majority

of which we expect to deliver before the end of 2007" and "[o]ur estimated backlog as of March

31, 2007, based on currently available information, also remained strong at $162 million, the

significant majority of which we expect to deliver within the next 12 months and which we

expect to drive increased operating income."

The IPO prospectus contained several cautionary statements.  First, referring to its use

of the terms "believe," "expect," "plan," "intend," "estimate," "anticipate" and similar

expressions, the prospectus explains that they "are intended to identify forward-looking

statements," which are "subject to risks and uncertainties that could cause our actual results to

differ materially from future results expressed or implied by the forward-looking statements."

In addition, the prospectus described the general risks related to the nature of defendant's

business, its product and the competitive environment.  It pointed out that defendant

8

TomoTherapy's "sole product is the Hi Art system, which we commenced marketing in 2003" and that the company "depend[s] on sales of the Hi Art system for substantially all of our revenue."  It explained that TomoTherapy's sole product "is a major capital equipment item that has a lengthy sales cycle," which "may contribute to substantial fluctuations in our quarterly operating results and stock price and make it difficult to compare our results of operations to prior periods."  Regarding the competitive environment, the prospectus stated that "[t]he market for radiation therapy equipment is characterized by intense competition and pricing pressure" and that TomoTherapy "face[d] competition from numerous competitors, many of whom have greater resources than we do."  The prospectus identified various other risks related to its business, including: its reliance on single-source suppliers for certain components of its product; that clinicians and patients may not accept the emerging technique provided by its product; that future development might be affected by the loss of existing research relationships, the inability to form new relationships or the inability to obtain license agreements; that a single supplier stores and ships most of the spare parts inventory around the world; that third-party health payors may not continue to provide sufficient coverage for treatment provided by the system; and that the company has a limited history of manufacturing.

The IPO described the potential impact on revenue of customers deferring installation, explaining that:

> If a small number of customers defer installation of a Hi-Art system for even a short period of time, recognition of a significant amount of revenue may be deferred to a subsequent period. For example, the deferral of a number of anticipated installations in the quarter ended September 30, 2005, resulted in revenue of $14.1 million in that quarter compared to $29.6 million in the prior quarter and $21.9 million in the subsequent quarter. Because

our operating costs are relatively fixed, our inability to recognize revenue in a particular quarter may adversely affect our profitability in that quarter.

The prospectus provided a related warning in the context of discussing its backlog. After stating that the company expected to deliver "the significant majority" of its backlog, the IPO prospectus stated that:

Notwithstanding these developments that management believes led to the recent increase in the value of our common stock, we cannot assure you that we will succeed in implementing our business strategy in the future and our business will continue to grow. In addition, we have in the past experienced, and expect to continue to experience in the future, substantial fluctuations in our quarterly operating results due in part to the timing of acceptances of Hi Art systems. These and other factors may result in substantial fluctuations in our stock price and valuation.

The IPO prospectus did not mention any of the following:

- that defendants' strategy of targeting for-profit accounts could mean that more of the orders in backlog could be "multi-unit" orders installed sequentially

- that the backlog already included multi-unit orders at the time of the IPO prospectus

- that the expected delivery time for sequentially-installed units would be closer to 24 months than the 9-12 months estimated for conversion of the backlog generally

- that orders from Sagemark were included in the backlog even though Sagemark's financial condition was "shaky at best" and Sagemark had a "side agreement" acknowledging that its orders were subject to financing; and

- that Sagemark could cancel its orders without paying liquidated damages.

Throughout the IPO, the company realized almost $185.6 million in net proceeds.

10

**B.  The Secondary Public Offering**

On October 11, 2007, TomoTherapy announced the pricing of a Secondary Public Offering (SPO) of 8,500,000 shares with an over allotment of 1,275,000 shares of its common stock at a price of $22.25.  Like the IPO prospectus, the registration statement and offering prospectus issued in connection with the SPO used the company's backlog as a "general indicator of the revenue expected to be recognized over the next year, when combined with the new sales contracts entered into early in the year."  Backlog was defined in the SPO prospectus in the same terms as in the IPO prospectus, but an additional sentence was added: "Backlog does not include any contingent orders received, such as those orders requiring board approvals or subject to financing, or any service contracts."

As in the IPO prospectus, the SPO prospectus described the backlog as a "better measure at any particular point in time of the long-term performance prospects of our business" and explained that, although "[t]he level of backlog will fluctuate . . . the majority of our backlog has historically been converted to revenue within twelve months of order placement."  The SPO prospectus provided the current backlog figures as well, stating that "[a]s of June 30, 2007, we had . . . a backlog of approximately $207 million" and "as of September 30, 2007, . . . we estimate that our backlog was at least $225 million."  In addition, the SPO prospectus explained a change in sales strategy as follows:

> The majority of our sales to date have been to university research
> centers, hospitals and cancer treatment centers that are early
> adopters of new technologies and that tend to replace equipment
> regularly in order to upgrade their treatment capabilities. Our sales
> strategy includes increasing sales to community hospitals and
> smaller treatment centers, which have traditionally been slower in

11

their adoption of new technologies primarily due to cost-based purchasing decisions.

Like the IPO prospectus, the SPO prospectus contained cautionary statements, but did not mention how the company's for-profit marketing strategy might affect the backlog's conversion cycle and possibly undermine the backlog's usefulness as a metric for determining future revenue. Moreover, the SPO did not mention that, although orders from Sagemark were included in the backlog, that company was "on the verge of financial collapse" at the time it made its order on June 28, 2007. The SPO was completed on October 16, 2007. During the SPO, defendant Robertson sold 26% of his shares for $5.6 million and Hathaway sold 10% of his shares for $889,000.

## VI.  Other Statements Made by Defendants

Defendants Robertson, Hathaway and TomoTherapy made several statements related to TomoTherapy's backlog outside the IPO and SPO prospectuses. For example, defendants stated several times that the company's backlog included only "firm" purchase orders or only "firm" and non-contingent orders:  at a June 13, 2007 earnings conference; on a Form 10-Q dated June 15, 2007; in an August 1, 2007 press release and at a subsequent conference call; on a Form 10-Q dated August 13, 2007; in an October 30, 2007 press release; on a Form 10-Q dated November 13, 2007 ; at a January 10, 2008 JP Morgan Conference; at a February 6, 2008 Merrill Lynch Conference; in a February 13, 2008 press release and at a subsequent earnings conference call.

Likewise, defendants stated several times that the backlog's conversion cycle could be expected to convert or had historically converted to revenue within 12 months:  in an August

1, 2007 press release and at a subsequent conference call; during a October 11, 2007 "ASTRO Investor Day" webcast presentation; in an October 30, 2007 press release; at a January 10, 2008 JP Morgan Conference; at a February 6, 2008 Merrill Lynch Conference; on a Form 10-K dated March 19, 2008.  Defendants made other related statements about the backlog, such as the statement made during a question and answer session with analysts June 13, 2007 that the sales cycle had not been lengthened and that when defendants had said that the "majority" of the backlog was expected to be converted in the year, they meant "something like 95% of the orders coming in in the next 12 months" were expected to be converted.  During a February 13, 2008 earnings conference call, defendants stated that, because an order is "generally in backlog for nine to twelve months before converting to revenue," TomoTherapy was "well positioned for growth in 2008 and beyond.  During the question and answer session that same day, defendants stated that the company "ha[dn't] seen much of a change" from its historical 9 to 12 month backlog conversion cycle.

Defendants made other statements regarding the backlog during these conference calls, press releases and other sessions, often describing the backlog as "strong," comparing its reliability to competitors' backlogs and comparing their growing backlog to prior backlog results as a measure of growth.  For the 2007 quarterly and yearly reports (Forms 10-Q and 10-K), defendants Robertson and Hathaway signed Sarbanes-Oxley certifications asserting that they had "reviewed this report," and affirming that "based on [their knowledge] this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to [avoid making any statement] misleading" and the financial information in the report "fairly presents in all material respects the financial condition for" the given period.

**VII. TomoTherapy Announces a Loss and Revises its Annual Guidance**

On April 17, 2008, defendants issued a press release announcing the company's financial results for the first quarter 2008, which ended March 31, 2008.  Defendant TomoTherapy announced a loss for the quarter and revised its annual guidance for 2008.  The press release explained the loss as follows:

> At the end of the fourth quarter, we estimated that 30% to 40% of our revenue would be generated in the first half of 2008 due to the strong order flow we saw in the second half of 2007 and the projected timing of customers' construction projects in 2008," said Fred Robertson, TomoTherapy's CEO. "That percentage range is still accurate, but we are seeing a further shift of customer system deliveries into both the second half of 2008 and into early 2009. As a result, our first-quarter results are slightly lower than we originally anticipated and we have revised our 2008 outlook. Given this development, we felt it prudent to provide an update in advance of our normal earnings call.
>
> * * *
>
> According to Robertson, a key contributing factor to the delivery shifts is that a growing portion of TomoTherapy's backlog consists of multi-unit orders from for profit entities. "These customers often place orders for multiple Hi·Art treatment systems and then install the units sequentially. This process causes some of these multi-unit orders to remain in backlog longer than single-system orders," said Robertson. "We also are somewhat cautious due to the weak economy which may cause some customers to further delay their acceptance timetable."

That same day, trading volume for TomoTherapy stock was in excess of eight million shares and the stock dropped by approximately 32% to close at $9.10 a share from a close of $13.35 the day before.  The drop in defendant TomoTherapy's stock price represented a loss of $213 million in market value in one day.

Following the press release, defendant TomoTherapy hosted a preliminary first-quarter results conference call with analysts.  Defendant Robertson stated that there were "two primary issues at play" in its first quarter loss and changed guidance: "our backlog now contains more multiunit orders and we're experiencing unanticipated sluggishness in Europe."  He predicted that, for the year's revenue, "the biggest impact is going to be this increasing number of multiunit systems that are in backlog and the sequential delivery . . ."  He further explained that although the domestic sales team had had success in targeting for-profit accounts, the orders placed were "often" for multiple systems to be installed sequentially, meaning that "some of these multiunit orders . . . remain in backlog longer than single system orders," so that "some of those [orders will] flo[w] into next year as opposed to being delivered this year."  In addition, defendant Robertson stated that the company had to reverse four units out of its backlog in the first quarter of 2008, the first time that had been done.  Included among the four reversed were three units from Sagemark.

In the company's defense, defendant Robertson explained that "we didn't have much experience [with multiunit orders] prior to 2007 so we saw a rapidly growing segment of our backlog with these multi-system deals.  So I think it's just based on our history in managing this type of backlog."

In response to defendants' announcements, analysts raised questions regarding TomoTherapy's backlog.  On April 18, 2008, Oppenheimer analyst Amit Hazan issued a report in which he stated that TomoTherapy was "removing units from backlog for the first time . . ., calling into question whether its backlog should be viewed reliably for visibility."  In the April 28, 2008 Oppenheimer report, Amit Hazan noted:

> TOMO Now has a lot to Prove. Aside from stopping its order
> growth slide, TOMO must now also re-build credibility in a
> backlog figure that appears vulnerable to more revisions (whether
> due to competition or broader hospital economic issues).
> Customers generally only have 3-4% of their order value at risk
> (many times less), and so opting out is an option. The visibility
> into backlog plays a big part in accurately predicting quarterly
> sales, and the variability in results has been fully exposed as a
> significant risk to this equity on any short-term basis.

On July 31, 2008, defendant TomoTherapy released its earnings for the second quarter

ending June 30, 2008 and disclosed that it removed orders totaling $53 million from its backlog

because of economic issues, uncertain shipments to its Japanese distributor, competitive losses

of two customers and changes to its definition of the backlog.

## ANALYSIS

### I.  Standard for Reviewing the Sufficiency of the Complaint

Plaintiffs assert claims under both the Securities Act of 1933 and the Securities and

Exchange Act of 1934.  As an initial matter, the parties dispute what pleading standard applies

to plaintiffs' claims.  At a minimum, every complaint must provide a "short and plain statement

of the claim showing that the pleader is entitled to relief," Fed. R. Civ. P. 8(a), and contain

"enough facts to state a claim to relief that is plausible on its face," *Bell Atlantic Corp. v. Twombly*,

550 U.S. 544, 570, 127 S.Ct. 1955, 1974 (2007); *see also Ashcroft v. Iqbal*, __ U.S. __, 129 S.Ct.

1937, 1949 (2009).  However, both Fed. R. Civ. P. 9(b) and the Private Securities Litigation

Reform Act of 1996 (PSLRA), 15 U.S.C. § 78u-4(b), set a higher pleading standard for certain

types of claims.  Rule 9(b) requires allegations of fraud to be pleaded with "particularity" and

the PSLRA requires a plaintiff to (1) identify each statement alleged to be misleading; (2) specify

the reasons why the statement is misleading; (3) state with particularity all facts supporting each allegation made "on information and belief"; and (4) state with particularity sufficient facts to allow a "strong inference" to be drawn that the defendant acted with scienter, or an intent to deceive.  15 U.S.C. § 78u-4(b)(1)-(2).

The parties agree that the heightened pleading standards of Fed. R. Civ. P. 9(b) and 15 U.S.C. § 78u-4(b) apply to claims made under the 1934 Act and that the PSLRA (§ 78u-4) does not apply to plaintiffs' 1933 Act claims.  The parties disagree whether Rule 9(b) applies to plaintiffs' claims for violations of § 11 of the 1933 Act.

Defendants acknowledge that generally, § 11 claims are not subject to the heightened pleading standard of Rule 9(b) because fraud is not an element of the claim.  They argue, however, that Rule 9(b) applies in this case because plaintiffs' § 11 claim overlaps with the fraud claim asserted under the 1934 Act.  Defendants point out that several courts have held that even 1933 Act claims must be held to the Rule 9(b) standard if they "sound in fraud," citing, *inter alia*, *Rombach v. Chang*, 355 F.3d 164, 171-72 (2[d] Cir. 2004); *California Public Employee's Retirement System v. The Chubb Corp.*, 394 F.3d 126, 160-63 (3[d] Cir. 2004); *Cozzarelli v. Inspire Pharms., Inc.*, 549 F.3d 618, 629 (4th Cir. 2008); *Lone Star Ladies Investment Club v. Schlotzsky's, Inc.*, 238 F.3d 363, 368 (5th Cir. 2001); *Rubke v. Capitol Bancorp Ltd.*, 551 F.3d 1156, 1161 (9th Cir. 2009); and *Wagner v. First Horizon Pharm. Corp.*, 464 F.3d 1273, 1278 (11th Cir. 2006).

Defendants contend that plaintiffs' § 11 claim "sounds in fraud" because it involves statements and omissions in the IPO and SPO prospectuses that are also included as part of his larger 1934 Act fraud claim.  Plaintiffs respond that the count alleging violations of § 11 expressly disavows fraudulent activity; however, a number of the cases cited by defendants have

17

applied Rule 9(b) to § 11 allegations made in conjunction with 1934 Act fraud claims even when the plaintiffs attempt to "disavow" the allegations of fraud in the context of the § 11 claim. *E.g.*, *Cozzarelli*, 549 F.3d at 629 (Rule 9(b) applied to § 11 claim, despite plaintiffs' conclusory disclaimer to the contrary, because complaint treated allegedly false statements in prospectus as part of a "single, coordinated scheme to defraud investors"); *The Chubb Corp.*, 394 F.3d at 160 and n.24 (plaintiffs' one-line disavowment of fraud in § 11 claim does not save it from Rule 9(b); "core theory of fraud permeate[d]" complaint, which contained no allegation of negligence and included language suggesting fraud); *see also Rombach*, 355 F.3d at 171-72 (Rule 9(b) applied to stand-alone § 11 claim because allegations that statement was "inaccurate and misleading," "untrue" and "false and misleading" are allegations "classically associated with fraud").

The approach taken by these courts is curious. Plaintiffs disavow fraud as the theory in support of their § 11 claim; if it turns out that they have no other theory besides fraud, then this claim perforce must fail. To the extent the § 11 claim includes allegations that a statement is "false" or misleading, this alone does not suggest fraud; such allegations are consistent with negligence. To the extent there is a concern that plaintiffs are creating "reputational harm" by making allegations of fraud, these concerns are allayed by requiring particularity *in the context of the fraud claim*, where the allegations are asserted. A plaintiff should have the option of pleading both fraud and something else without having his non-fraud claims subject to dismissal under Rule 9(b) as collateral damage of a fraud claim that does not survive Rule 9(b) scrutiny . Moreover, as a practical matter, a plaintiff incapable of pleading with sufficient particularity usually has the option after a Rule 9(b) dismissal to amend his complaint by removing the fraud claim and any allegations of fraud. *E.g., Lone Star Ladies*, 238 F.3d at 367-69 (abuse of

18

discretion for court to deny plaintiffs' requests for leave to amend complaint to remove 1934 Act fraud claims and remove fraudulent allegations from § 11 claim; the new claims would not have "sound[ed] in fraud.").

At any rate, this circuit does not appear to endorse such a far-reaching application of Rule 9(b).  Although in *Sears v. Likens*, 912 F.2d 889, 892-93 (7th Cir. 1990) (Crabb, J.), the court applied Rule 9(b) to a § 11 case, it did so in dicta and without discussion, as Judge Crabb later recognized in *Friedman v. Rayovac Corp.*, 295 F. Supp. 2d 957, 977-79 (W.D. Wis. 2003), when she declined to follow that approach.  The only case from this circuit that supports defendants' position at all is *Kennedy v. Venrock Associates*, 348 F.3d 584, 593-94 (7th Cir. 2003), in which the court explained in a different context that Rule 9(b) applies whenever a claim relies on fraud, even if it is not an element of the claim.  At the same time, *Kennedy* does not suggest that fraud alleged elsewhere in the complaint would somehow "infect" the independent claim.  To the contrary:

> [I]f both fraudulent and nonfraudulent conduct violating the same statute or common law doctrine is alleged, only the first allegation can be dismissed under Rule 9(b), though if, while the statute or common law doctrine doesn't require proof of fraud, *only* a fraudulent violation is charged, failure to comply with Rule 9(b) requires dismissal of the entire charge.

*Id.* at 593 (citations omitted, emphasis added).  *See also Rubke*, 551 F.3d at 1161 (complaint "sounds in fraud" if it alleges "a unified course of fraudulent conduct" and relies "*entirely* on that course of conduct as the basis of a claim.") (internal quotations omitted and emphasis added).

In other words, unless fraud is the only theory that supports the § 11 claim, Rule 9(b) cannot eliminate the claim, it only can eliminate the accompanying allegations of fraud.  In a

case like this one, where fraud has been disavowed for that claim, the proper approach is to hold plaintiffs to their word: the § 11 claim shall not proceed on a theory of fraud.  To the extent the § 11 allegations allow the inference that the violation was a result of non-fraudulent conduct, the claim may proceed without requiring plaintiffs to plead fraud with particularity.  This approach leaves the complaint in the hands of the plaintiffs while ensuring that the defendants are sufficiently protected from baseless allegations of fraud, one purpose of Rule 9(b).

In this case, the § 11 allegations are consistent with negligence.  Although plaintiffs allege in the context of their fraud claims that defendants intentionally withheld important information from the IPO and SPO prospectuses, the § 11 allegations leave open the possibility that the misleading registration statements were the result of nothing more than inexperience or a lack of awareness on the part of the issuer.  Therefore, I will analyze plaintiffs' 1933 Act § 11 claims for sufficiency under Rule 8, while the 1934 Act fraud claims will be analyzed under Rule 9(b) and the PSLRA.

## II.  Securities Act of 1933 Claims

Plaintiffs allege that defendants may be held liable under §§ 11 and 15 of the 1933 Act for misleading statements found in defendant TomoTherapy's IPO and SPO prospectuses.  15 U.S.C. §§ 77k and 77o.  Section 11 of the Securities Act of 1933 allows "any person acquiring a security" to sue "every person who signed [a] registration statement" and every director and partner of an issuer of a registration statement:

> [i]n case any part of the registration statement, when such part became effective, contained an untrue statement of a material fact

> or omitted to state a material fact required to be stated therein or
> necessary to make the statements therein not misleading

15 U.S.C. § 77k. Section 15 expands the scope of liability set forth in section 11 to "controlling persons." Defendants do not deny that the prospectuses may be considered as part of the "registration statement" for which defendants may be held liable under §§ 11 and 15.

Defendants move to dismiss on several grounds, arguing that (1) the statements in defendant's IPO and SPO prospectuses are not false or misleading; (2) the statements and omissions plaintiffs identify are not material; (3) the IPO and SPO included enough cautionary language to protect defendants from the potentially misleading nature of the omissions identified; and (4) the complaint establishes that defendants engaged in due diligence and cannot be held liable for the omissions.[3]

## A. False or Misleading

Plaintiffs allege that the IPO and SPO prospectus statements were false or misleading for two different reasons: (1) because they suggested that "a majority" or a "significant majority" of the backlog still could be expected to be converted to revenue within 12 months without revealing that TomoTherapy's change in business strategy would slow the company's historical 12-month backlog revenue conversion rate by bringing in slower-vesting multi-unit orders; and (2) because defendants stated that the backlog included only "firm orders" (and the SPO prospectus added that the backlog did not include any "contingent orders") without revealing

---

[3] Defendants also challenge plaintiffs' section 15 claim, but only insofar as it is dependent upon plaintiffs' section 11 claim. The parties agree that for the purpose of defendants' motion to dismiss, the two types of claims stand or fall together.

21

that the backlog included orders from Sagemark that were subject to financing, exempted from the cancellation provision allowing for liquidated damages and not likely to convert to revenue. Defendants respond that (1) none of the statements about the backlog were "misleading" because the backlog revenue projections ended up being accurate; (2) the statements about the backlog conversion rate were not misleading because the allegations do not establish that something less than a "majority" or significant majority" of orders were converted within the 12 months following the statements; and (3) the statements that the backlog had only "firm" or non-contingent orders were not misleading because the allegations do not establish that any of the orders in the backlog were not "firm" or were contingent.  As discussed below, I conclude that defendants' first and third contentions are incorrect but their second contention is correct.

### (1) The accuracy of defendants' projections of revenue from the backlog

Defendants first contend that both of plaintiffs' claims fail because the statements in the IPO and SPO prospectuses regarding TomoTherapy's backlog were projections about the company's revenues, and those projections turned out to be accurate, as shown by the company's actual revenue figures.  This argument has several problems.  First, defendants point to their own submissions to establish the company's actual revenue figures; these are facts outside the pleadings and therefore not appropriate for consideration in deciding defendants' motion to dismiss.

Second and more substantively, defendants mischaracterize the statements in the IPO and SPO prospectuses.  The backlog projections were not simply a rough estimate of the actual revenue to come.  Although the IPO and SPO prospectuses stated that the backlog could be seen

as a "general indicator of the revenue expected to be recognized over the next year," this was only "when combined with the new sales contracts entered into early in the year." Likewise, the prospectuses indicated that backlog was only a "significant portion" of revenue. Thus, even if defendants could show that TomoTherapy's revenue was greater than the backlog amounts for each quarter, that would not establish that the backlog projections were accurate. To establish this point, defendants would have to show that the revenue they identify actually came from the backlog and that a "majority" or a "significant majority" of the backlog actually was converted into revenue as promised. Defendants do not suggest they can establish as much now, even on the facts they supply outside the pleadings.

### (2) The accuracy of defendants' predictions that the "majority" or "significant majority" of the backlog would convert to revenue within 12 months

Defendants also challenge each of plaintiffs' § 11 claims individually. First, they address plaintiffs' claim that the prospectuses were misleading because they did not reveal the impact of the multi-unit orders on the backlog's conversion cycle. Defendants contend that plaintiffs have not identified enough slow orders in the backlog when the IPO and SPO prospectuses were issued to show that it was false or misleading for defendants to state that the company expected a "significant majority" (in the IPO prospectus) or a "majority" (in the SPO prospectus) of the backlog to convert to revenue within twelve months and to point to its historical backlog conversion cycle as a reliable estimate of its current backlog's performance. Defendants point out that plaintiffs have identified only a few multi-unit orders in the backlog (three when the

IPO prospectus was issued and twelve when the SPO prospectus was issued), which represented a very small percentage of the total backlog.

Plaintiffs concede that they are not alleging that the backlog was "filled with multi-unit orders" at the time of the IPO or the SPO.  Plaintiffs contend however, that they are not required to establish that the backlog at the time of the IPO or SPO prospectus had so many multi-unit orders that it was unrealistic for defendants to report that the company expected a "majority" or "significant majority" of the backlog to convert.  Rather, say plaintiffs, defendants had a "duty to disclose" more about the backlog than it did.  But under § 11 of the 1933 Act, the only "duty to disclose" information in registration statements is a duty to disclose that information "necessary to make the statements . . . not misleading."  15 U.S.C. § 77k.

Plaintiffs argue that once defendants started "touting" the backlog, defendants were required to disclose every detail that might be relevant to the backlog's continuing usefulness, citing *Berson v. Applied Signal Technology, Inc.*, 527 F.3d 982, 984 (9th Cir. 2008).  In *Berson*, the court found that a company's failure to disclose the presence of certain "stop-work" orders in its backlog was misleading, explaining that the company's decision to "tout" its backlog required it "[to] do so in a manner that wouldn't mislead investors as to what the backlog consisted of."  *Id.* at 987.

However, *Berson* does not stand for the proposition that use of a backlog requires full disclosure.  In *Berson*, defendants had made statements suggesting that all the orders in the backlog could be relied upon as future revenue and only contractual cancellation or modifications could stand in the way of those orders converting into revenue, *id.* at 986, but the stop-work orders in the backlog were orders for which the defendants had already stopped

receiving money and for which a "heightened risk" existed that the company would never earn any money, *id.* at 984. By failing to mention the stop-work orders, defendants created a false impression regarding the likelihood that those orders would convert into revenue; for this reason it was "necessary" to mention the stop-work orders. *Cf. Brody v. Transitional Hospitals Corp.*, 280 F.3d 997, 1006 (9th Cir. 2002) (omission is "misleading" under securities laws if it "affirmatively create[s] an impression of a state of affairs that differs in a material way from the one that actually exists").

In the instant case, defendants "touted" their backlog by stating that the "majority" or "significant" majority of the current backlog could be expected to convert in 12 months and by pointing to historical backlog conversion cycles. But what false impression did they create? The few multi-unit orders in the backlog at the time of the IPO and SPO statements do not undermine defendants' prediction that a "majority" or "significant majority" of the backlog would convert within the next 9-12 months or provide grounds for inferring that the current backlog would perform much differently than it had historically. Although plaintiffs contend that defendants should have disclosed the expected impact of TomoTherapy's new business strategy (of targeting for-profit institutions), the allegations do not establish more than a speculative link between this strategy and any changes in the backlog conversion timeline.

Plaintiffs' final argument on this point is that it is too early to tell what a "majority" might suggest. Plaintiffs, however, do not argue that the small percentage of multi-unit orders allegedly in the backlogs might amount to a "majority" by any common meaning of the term. They are left to observe that, outside the registration statements, defendants once suggested that "majority" might mean "95%." This is irrelevant to determining whether a registration

statement is misleading; therefore, there is simply no basis for holding that the IPO and SPO statements were "misleading" for omitting information about multi-unit orders or a business strategy aimed at for-profit companies. Defendants' motion to dismiss will be granted on this claim.

This dismissal is premised on plaintiff's failure to plead sufficient facts to support the inference that enough of the backlog was composed of multi-unit orders to make it misleading for defendants to suggest that a "majority" or "significant majority" of the backlog was likely to convert to revenue in 12 months or that the backlog could be expected to convert as it had historically. It seems unlikely that plaintiffs could revivify this claim (they would have to uncover many more multi-unit orders in the backlog to establish that it was misleading to suggest that a "majority" of the orders would likely convert as usual). Nonetheless, it is possible, and for that reason, I am dismissing this claim without prejudice.

### (3) The accuracy of defendants' statements that the backlog contained only orders that were "firm" or non-contingent.

Plaintiffs claim that the IPO and SPO prospectuses were false or misleading because they stated that the backlog contained only "firm" or non-contingent orders when it actually contained orders from Sagemark that were contingent and not "firm." The allegations plaintiffs identify in support of his contention that the Sagemark orders were not firm and were contingent involve email correspondence between the CEO of Sagemark and certain employees of TomoTherapy in which Sagemark cautioned that it was placing orders with the understanding that these orders were subject to Sagemark receiving financing and TomoTherapy employees promised to return the full deposit if Sagemark wanted to cancel.

26

Defendants respond that even if plaintiffs' allegations are true, Sagemark's orders were not contingent upon financing and the deposit was not fully returnable because Sagemark signed the standard contract, which included a liquidated damages provision and a provision that the terms could not be altered and the company did not authorize any employee or agent to alter them (except, apparently, the CEO in writing).

Defendants' argument raises several issues, none of which can be addressed at this early stage of the proceedings. Defendants argue the standard terms bar all possible "side" contracts that TomoTherapy's employees may have prepared, while plaintiffs argue that the employees may have had "apparent authority" and may have been capable of modifying the terms of Sagemark's agreement. Although defendants note that the Standard Contract is an integrated contract, this does not rule out the possibility that defendants' employees, acting with apparent authority, nonetheless modified terms *after* the contract was signed. Although defendants ultimately might establish that any such side agreements were not binding, plaintiffs have alleged enough facts to support the plausible inference that the agreement was indeed binding. This is all Rule 8 requires.

In any event, § 11 would not require that the side agreement be legally "binding." Defendants' statements that the backlog contained only "firm" orders (and in the SPO prospectus that there were no "contingent" orders) created the natural impression the backlog represented orders merely waiting to be filled, essentially money in the bank within the year. The prospectuses state that orders would include a "signed quotation or purchase order from the customer, including the required down payment, if any;" this suggested that the Standard Terms and any required down payment marked the boundaries of possible risks involved in losing an

27

order.  But Sagemark's orders came with other risks not disclosed, and in the case of the SPO prospectus, explicitly disclaimed.  There were potential financing contingencies and the possibility of a full return of Sagemark's deposit.  Even if Sagemark may not have been able to escape the binding terms of the Standard Agreement, the correspondence revealed a serious risk that Sagemark would cancel, and perhaps sue for the full return of its deposit.  Sagemark's allegedly "shaky" overall financial condition further supports the inference that the Sagemark orders were at serious risk of cancellation.

Defendants' failure to disclose Sagemark's side agreement makes this claim similar to the nondisclosures decried in *Berson*, *supra*, 527 F.3d at 986.  Sagemark's orders were at "serious risk of being cancelled" and this key fact was not disclosed.  Defendants point out that any order could be canceled because the Standard Terms allowed for cancellation.  But there's a key difference here: for most orders, cancellation came at a price: Tomotherapy kept 25% of the deposit as liquidated damages.  Sagemark's side deal suggested that the company would seek cancellation and possibly obtain cancellation at no cost.

Although defendants suggest that Standard Terms put investors on notice that any customer could cancel, as the court pointed out in *Berson*, 527 F.3d at 986, statements about the general risk of customers' ability to cancel or modify contracts do not prevent omissions from being misleading when the omissions involve risks that have "already come to fruition" in a more specific way.  In *Berson*, that risk was stop orders; here, it is a set of orders with special contingencies and uncertainties.  As in *Berson*, it was misleading for defendants to tout TomoTherapy's backlog without disclosing the generalized and particularized risks related to the backlog.  Plaintiffs' allegations related to the Sagemark orders allow an inference to be drawn

28

that the backlog included orders that were contingent and not "firm."  At the very least, it was misleading to state that all orders were "firm" or not "contingent" in light of Sagemark's special risks of cancellation.

## B.  Cautionary language and Materiality

Section 11 liability attaches only if a misleading statement is material.  15 U.S.C. § 77k(a).  Defendants contend that the Sagemark order omissions from the IPO and SPO prospectus statements were not material because the prospectuses contained extensive cautionary language and because the Sagemark orders themselves affected only a small percentage of the total backlog.[4]

A statement or omission is "material" when there exists "a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available."  *Basic Inc. v. Levinson*, 485 U.S. 224, 230-31 (1988).  Defendants' first challenge to the materiality of the Sagemark omissions relies on a doctrine called the "bespeaks caution" doctrine, which provides that when "forecasts, opinions or projections in a disclosure statement are accompanied by meaningful warnings and cautionary language" then an allegedly misleading omission may be rendered immaterial.  *Harden v. Raffensperger, Hughes & Co.*, 65 F.3d 1392, 1404 (7th Cir. 1995) (citing 3B Harold S. Bloomenthal, *Securities and Federal Corporate Law* § 8.26 [1] at 8-110 (1995)).

---

[4] Defendants also challenged the materiality of the omissions related to the multi-unit orders. Because I have concluded that the statements and omissions about the multi-unit orders were not misleading, there is no need to consider their materiality.

But as plaintiffs point out, the "bespeaks caution" doctrine applies to forward-looking statements, not statements about the present state of affairs. *Harden*, 65 F.3d at 1406. The statements related to the presence of the Sagemark orders in the backlog report the actual state of the backlog (statements that the backlog contained only "firm" orders, Cpt., ¶¶ 31 and 34, or, in the SPO prospectus, that the backlog did not include any contingent orders, ¶ 34.)

That said, cautionary statements still may be relevant to determining the materiality of the allegedly misleading omissions about the Sagemark orders. To the extent they include information relevant to the "total mix" of information available to reasonable investors, they could tip the scales in favor of a conclusion that the omissions are immaterial. If the cautionary language reveals enough information about a company's risks, then a particular omission may become unimportant to a reasonable investor and therefore immaterial. *In re Donald J. Trump Casino Securities Litigation*, 7 F.3d 357, 369-77 (3d Cir. 1993) (statement that company believed that operation funds of Taj Mahal would be sufficient to cover all its debt service not material in light of both general warnings that company could not assure repayment and specific discussions detailing various risk factors related to completion and operation of Taj Mahal).

The Court of Appeals for the Seventh Circuit cautions against determining materiality on a motion to dismiss:

> The determination of materiality requires delicate assessments of the inferences a 'reasonable shareholder' would draw from a given set of facts and the significance of those inferences to him, and these assessments are peculiarly ones for the trier of fact; thus a materiality determination is rarely appropriate at the summary judgment stage, let alone on a motion to dismiss.

*Marks v. CDW Computer Centers, Inc.*, 122 F.3d 363, 370 (7th Cir. 1997) (internal quotations and citations omitted).  However, as defendants point out, several courts have decided the issue of materiality on a motion to dismiss, usually under the standard that the information found to be immaterial is "so obviously unimportant to an investor that reasonable minds [could not] differ on the question of materiality."  *Klein v. General Nutrition Companies, Inc.*, 186 F.3d 338, 342 (3d Cir. 1999); *In re Stac Electronics Securities Litigation*, 89 F.3d 1399, 1405 (9th Cir. 1996) (same); *ECA, Local 134 IBEW Joint Pension Trust of Chicago v. JP Morgan Chase Co.*, 553 F.3d 187, 198 (2d Cir. 2009) (same).

Although defendants have identified several cases that found materiality as a matter of law on motions to dismiss, many of these cases do not apply because they involve interpreting the meaning of the allegedly misleading statements, *Rosenzweig v. Azurix Corp.*, 332 F.3d 854, 869-70 (5th Cir. 2003); *Kapps v. Torch Offshore, Inc.*, 379 F.3d 207, 217, or involved circumstances where there were other sources for discovering the missing information, *e.g., In re Stac Electronics Securities Litigation*, 89 F.3d 1399, 1408-09 (9th Cir. 1996); *Klein*, 186 F.3d at 343.

In other cases, statements were found to be immaterial because they were made in the context of warnings sufficiently related to the statement or omission so as to undermine any importance an investor may have accorded it.  *See, e.g., Trump*, 7 F.3d at 369-77; *Klein*, 186 F.3d at 344 (finding omission of information that same store sales were affected by other branches opening nearby immaterial where prospectus warned that profitability of expansion depended on obtaining suitable sites); *J&R Marketing, SEP v. General Motors Corp.*, 549 F.3d 384, 395-96 (6th Cir. 2008) (statement by GMAC that it had "benefitted from significant reduction in unsecured borrowing spreads" and that GM's outlook had "improved partially" immaterial

31

because GMAC also disclosed that its unsecured credit spreads were near historic highs due to weakness in automotive sector and specific concerns regarding GM's outlook).

In this case, the cautionary statements identified by defendants do not sufficiently address and ameliorate the fact that the backlog included the fragile and skittish Sagemark orders.  True, defendants warned of general risks the company faced (a one-product company facing stiff competition and selling a product with a high price and a long sales cycle), they warned that their quarterly operating results may fluctuate "due in part to the timing of acceptances of the Hi Art systems" and they carefully chose their verbs to report that the company simply "estimated" and "expected" certain results from the backlog.  But at this early stage, none of these warnings is specific enough to the risks attendant to the Sagemark orders in the backlog so as to warrant dismissal pursuant to the "bespeaks caution" doctrine.  *In re NationsMart Corp. Securities Litigation*, 130 F.3d 309, 318 (8th Cir. 1997) ("bespeaks caution doctrine cannot, simply as a matter of pleading, defeat the plaintiffs' § 11 claim" because warnings in the prospectus were not sufficiently specific to the risk allegedly omitted).  I cannot conclude at the pleading stage that the stability of the backlog orders would have been "obviously unimportant" to reasonable investors, particularly when defendants emphasized in the prospectuses that the backlog was limited to "firm" orders (and later in the SPO prospectus, further clarify that the backlog did not include "contingent" orders).

The only other argument defendants assert for a finding of immateriality is that the Sagemark order comprised only a small percentage of the total backlog: defendants calculate that it was 8.7% at the time of the SPO, which would make the percentage at the time of the IPO about half that. When an omission is little more than a "drop in the bucket," plaintiffs are hard-

pressed to argue that a reasonable investor would consider the omitted information important to determining whether to invest in the company. *Parnes v. Gateway 2000, Inc.*, 122 F.3d 539, 550 (8th Cir. 1997) (company's overstatement of assets by 2% not material); *ECA, Local 134 IBEW Joint Pension Trust of Chicago v. JP Morgan Chase Co.*, 553 F.3d 187, 202-03 (2[d] Cir. 2009) (transactions not material because they were "a minute fraction of assets"). Defendants point to *Parnes*, 122 F.3d at 550, in which the court found that the company's overstatement of assets by 2% was not material as a matter of law because "a reasonable investor, faced with a high-risk/high-yield investment opportunity in a company with a history of very rapid growth, would not have been put off by an asset column that was 2% smaller." *See also ECA*, 553 F.3d at 202-03.

There are important differences between this case and *Parnes*. First, as a matter of percentages, the impact identified in this case is at least double that brushed off in *Parnes*, and was fourfold by the time of the SPO prospectus. Second, although the company in *Parnes* was "risky," it was not identified as a "young" company. In this case, disclosure that a fledgling company's backlog included wobbly or "contingent" orders could well have led investors to doubt the future growth of the company and could have created greater uncertainty about the company's ability to hold up in the market. There is a colorable argument that reasonable investors would have deemed important additional disclosures about the Sagemark orders in the backlog. Perhaps development of the record will drain the color from this argument, but at this stage, defendants are not entitled to dismissal as a matter of law.

33

### C.  Due Diligence

Finally, defendants assert the "due diligence" defense, which provides that no person other than the "issuer" of the registration statements (here, the prospectuses) may be held liable if that person "had, after reasonable investigation, reasonable ground to believe and did believe, at the time such part of the registration statement became effective, that the statements therein were true and that there was no [actionable] omission."  15 U.S.C. § 77k(b)(3)(A).  A "reasonable investigation" is that which would be performed by "a prudent man in the management of his own property."  15 U.S.C. § 77(c).

Defendants acknowledge that "due diligence" is an affirmative defense for which they have the burden of proof, but argue that in this case the issue may be decided on the pleadings alone because the defense is "plain from the face of the complaint."  *See* dkt. 29 at 35 (citing *Walker v. Thompson*, 288 F.3d 1005, 1009 (7th Cir. 2002)).

In addition to repeating their arguments that the alleged omissions were neither material nor misleading, defendants contend that the official company paperwork suggested that there were no contingencies in the Sagemark orders and that these order were governed by the Standard Terms, just like any other order on the backlog.  This may be so, but it does not establish that any of defendants could rely on the "official company paperwork."  Defendants' argument that they had no obligation to sift through all company emails misses the mark.  The allegations in the complaint do not preclude the possibility that (1) defendants knew about the side agreement with Sagemark or (2) there were other records of the side agreement that could have been discovered easily upon "reasonable investigation."  Therefore, the complaint does not "on its face" establish defendants' affirmative defense.

34

### III.  Securities Exchange Act of 1934 Claims

Plaintiffs contend that the statements made in the IPO and SPO prospectus and other statements made by defendants Robertson and Hathaway regarding TomoTherapy's backlog amount to fraud actionable under § 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5 promulgated thereunder.  15 U.S.C. § 78j(b); 17 C.F.R. § 240.10b-5; *see also Superintendent of Insurance v. Bankers Life & Casualty Co.*, 404 U.S. 6, 13, n. 9 (1971) (recognizing that "private right of action is implied under § 10(b)").

> In a typical § 10(b) private action a plaintiff must prove (1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation.

*Stoneridge Investment Partners, LLC v. Scientific-Atlanta*, 128 S.Ct. 761, 768 (2008) (citing *Dura Pharmaceuticals, Inc. v. Broudo*, 544 U.S. 336, 341-342 (2005)).

Defendants raise several challenges to plaintiffs' fraud claims, contending that (1) plaintiffs' complaint does not adequately plead falsity;  (2) the allegations do not establish a strong inference of scienter; (3) the allegations fail to identify any statement or omission that was material or anything more than mere "puffery," which is not actionable; and (4) the allegations  do not meet the pleading requirement for loss causation.

### A.  Failure to Plead Falsity

I already have addressed some of the issues relevant to a determination of plaintiffs' 1934 Act § 10(b) claims above in the context of the 1933 Act § 11 claims.  For the same reason plaintiffs' complaint fails to establish that the statements in the IPO and SPO prospectus related

to the multi-unit orders were misleading for its 1933 Act § 11 claim, it fails to establish that the statements could be an actionable "misrepresentation or omission" for its 1934 Act § 10(b) claim. Statements that are not "misleading" for the purpose of the 1933 Act are also not "misleading" for the purpose of the 1934 Act. *Brody*, 280 F.3d at 1006 ("To be actionable under the securities laws, an omission must be misleading.").

That said, plaintiffs' § 10(b) claims cover statements other than those made in the prospectuses. (Unlike 1933 Act § 11 claims, which are limited to registration statements, 1934 Act § 10(b) claims may involve any statement connected to a purchase or sale of a security. 15 U.S.C. § 78j(b)). The non-prospectus statements plaintiffs identify as misleading are mostly identical to those found in the prospectus. Thus, as to those statements related to the 9 to 12 month backlog conversion cycle, it might appear that they could not be misleading for the same reason that the prospectus statements are not.

But at least some of these statements were made later, and that changes the calculus. According to the complaint, defendants stated in April 2008 that over the past year "about a third" of the backlog had become multi-unit orders that could be expected to have a slower conversion rate. At the same time, as late as February 2008, defendants continued to state that the company had not seen much of a change from the historical 9 to 12 month conversion cycle. It is plausible to infer that, by February 2008, defendant TomoTherapy *had* seen a change from its conversion cycle, given the swelling number of multi-unit orders in the backlog. At some point, certainly by February 2008, it was misleading to suggest that the historical backlog conversion rate continued to be reliable. As for statements related to the Sagemark orders (that

36

the backlog was "firm" and not contingent), defendants do not raise any new argument that the statements would not be considered misleading or false for the purpose of § 10(b).

### B.  Strong Inference of Scienter

Under the PSLRA, § 10(b) fraud claims must be supported by allegations that "with respect to each act or omission alleged to violate [§ 10(b)], state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2).  The "required state of mind" for § 10(b) claims is scienter, "a mental state embracing intent to deceive, manipulate or defraud." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 127 S.Ct. 2499, 2507 (2007) (citing *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193-94, n. 12 (1976)).  Scienter does not require actual knowledge of a falsity or the misleading nature of a statement; reckless disregard of the truth is also sufficient.  *S.E.C. v. Jakubowski*, 150 F.3d 675, 681 (7th Cir. 1998) (citing *Sundstrand Corp. v. Sun Chemical Corp.*, 553 F.2d 1033, 1044-45 (7th Cir. 1977)).  In *Tellabs*, the Supreme Court explained that

> A complaint will survive . . . only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged.

*Tellabs*, 127 S.Ct. at 2510.[5]

Making this determination, the court is to consider the circumstances collectively rather than individually.  *Id.* at 2511.  Plaintiffs identify the allegations they contend give rise to a "strong inference" of scienter:  the Hi-Art system was defendants' only product; defendant

---

[5]  The goal being "to curb frivolous, lawyer-driven litigation, while preserving investors' ability to recover on meritorious claims."  *Id.* at 2509.

Robertson was a "hands-on" CEO who detailed the number of orders placed and systems delivered and installed during quarterly meetings, according to an anonymous Manufacturing Assembler who went to the meetings; defendants Robertson sold 26% of his shares (for $5.6 million) in the SPO and Hathaway sold 10% of his shares (for $889,000) in the SPO; defendants Robertson and Hathaway each attested multiple times (in accordance with § 302 of the Sarbanes-Oxley Act) that they had investigated the information presented in their quarterly and yearly reports and none was found to be "false or misleading"; and defendants had limited experience dealing with multi-unit orders. Plaintiffs present this totality of circumstances as support for their claims that defendants knew about or recklessly disregarded (1) the impact of defendants' for-profit strategy on the backlog conversion cycle and (2) the presence of the Sagemark orders in the backlog. Considering these allegations as a collective whole, I do not find that the inference of scienter on either claim is at least as strong as the inference that there was no scienter here. Let's break this out a bit:

Plaintiffs' allegations are sufficient to support the inference that defendants Robertson and Hathaway knew at least generally what orders were in the backlog before they made statements about the backlog. TomoTherapy only had one product and defendants relied heavily on the backlog as their metric for future revenue estimates. Moreover, the size of each order was substantial; with 6 orders valued at $18 million, it would be reasonable to infer that the backlog in 2007 contained no more than 70 or 80 orders, perhaps fewer. It is logical and fair to infer that defendants Robertson had a reasonably clear idea of the orders on a list of 70 or 80 that constituted what they considered the key metric for estimating the company's imminent revenue. Plaintiffs' other allegations further support this inference. Defendants' Sarbanes-Oxley

38

statements suggest that defendants Robertson and Hathaway investigated the statements about the backlogs before they made them and the allegedly "hands-on" nature of defendant Robertson suggests that defendant Robertson would have kept tabs on orders being placed in the backlog.

Assuming that defendants Robertson and Hathaway knew what orders were in the backlog at any given time, perhaps it also is logical and fair to infer that they knew approximately how many were multi-unit orders: by February 2008, the last time plaintiffs identify that defendants "touted" the 12 month backlog conversion cycle, at most "about one third" of the backlog consisted of multi-unit orders. However, it is something of a stretch to infer that defendants knew enough about how multi-unit orders worked to understand that their conversion rate could be significantly slower than 9 to 12 months. We have to stretch further to infer that defendants knew that their backlog was too cluttered with multi-unit sequential orders to allow defendants to claim that a "majority" of units would convert within the predicted time frame.   There are not enough facts in the complaint about the transparency of the conversion rate of multi-unit orders to draw this inference.  For example, when are conversion rates known about orders?  The post hoc statement from defendants that customers seeking multi-unit orders "often place [such] orders . . . and then install the units sequentially" does little to answer this question.  In fact, simple arithmetic suggests that even if a third of the backlog consisted of multi-unit orders, it still was accurate to predict that a majority of the orders would convert to revenue with a year, unless the multi-unit orders totaled twice as many units as the single-unit orders.[6]

---

[6]  To keep the math simple, let's assume that defendants had 75 orders and that 1/3 were for multiple units.  If we fairly assume that all of the multi-unit orders would take delivery of the first unit

Then there's the fact that defendants allegedly "didn't have much experience" dealing with for-profit entities or managing that type of backlog.  Although plaintiffs argue that this makes it reckless for defendants to continue to rely on the backlog,[7] it is more akin to negligence.[8]  Because the inference of scienter is not as strong as the inference of negligence regarding defendants' handling of the multi-unit composition of the backlog, the PSLRA requires dismissal of plaintiffs' §10(b) claim as it relates to statements made about TomoTherapy's backlog conversion cycle.

TomoTherapy's statements related to the Sagemark are more problematic for defendants.  If defendants can be deemed to know orders were in the backlog, then they must have known that the Sagemark orders were in there.  Still, this does not establish that they knew that the Sagemark orders were not "firm" or were otherwise "contingent."  Although plaintiffs point out that defendants should have known about Sagemark's allegedly "shaky" financial condition, the facts do not suggest that Sagemark's financial condition was so grave that it was unreasonable to expect it to follow through on its order.  So the more pertinent question for inferring scienter is: what did defendants know about the alleged side agreement?  Plaintiffs' allegations do not

---

within 9 to 12 months, then 75 units (one for every order) would be delivered during this time period. For this to be less than a majority, the 2nd through $n^{th}$ unit of the 25 multiple unit orders would have to total 76 units.  Adding the first unit back to each of these orders means that the 25 multi-unit orders would account for 101 units, and the 50 single-unit orders of course would account for 50 units.

[7] That is, an extreme departure from the standards of ordinary care to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it, *U.S.S.E.C. v. Lyttle*, 538 F.3d 601, 603 (7th Cir. 2008)

[8] Generally, the failure to do something that a reasonably careful person would do under similar circumstances, *e.g., Alcala v. Emhard Industries, Inc.* 495 F.3d 360, 364 (7th Cir. 2007) (Illinois's formulation).

sufficiently link any of defendants with the side agreement.  Yes, it is *possible* to infer from Sagemark's apparent reliance on the side agreement that defendants Robertson and Hathaway (or at least Robertson, the CEO) had agreed to it.  After all, as defendants point out, the Standard Agreement suggests such a side agreement was worthless without the CEO's imprimatur.

However, defendants' possible involvement in the side agreement is only one inference that may be drawn, not the strongest.  A stronger inference is that defendants were not involved in the side agreement because it was between the CEO of Sagemark and too-hungry salespeople at TomoTherapy who lacked actual authority to enter side deals with customers.  None of the emails plaintiff identifies included defendants or suggested that any of them were involved in the side agreement.  Moreover, Ed Douglas states that he "gave them *my* word" and asks if they would "be comfortable with a letter from [my] director . . . as a side bar to the contract."  As defendants point out, the Standard Terms provided that only the CEO could modify them.  Once again the inference of scienter is not as strong as other inferences that may be drawn from the allegations, the PSLRA requires dismissal of this claim as well.

Then there are the stock sales: Robertson sold 26% of his shares for $5.6 million in the SPO and Hathaway sold 10% of his shares for $889,000 in the SPO.  Where is the line between a senior executive guilelessly cashing in some stock to reap the fruits of his hard work, and that senior executive cynically feeding bunkum to the public so that he may cash in before the company tanks?  "Personal financial gain may weigh heavily in favor or a scienter inference."  *Tellabs*, 127 S.Ct. at 2511.  Even so, because executives buy and sell stock regularly, their sales must be unusual or suspicious to constitute circumstantial evidence of scienter.  *Pugh v. Tribune*

41

*Co.*, 521 F.3d 686, 695 (7th Cir. 2008).  Hathaway's sale of a mere tenth of his shares cannot be viewed as unusual or suspicious and therefore does not imply scienter.  *See, e.g., Cozzarelli v. Inspire Pharmaceuticals, Inc.*, 549 F.3d 618, 627-28 (4th Cir. 2008) (three directors' sale of up to 13% of their stock did not create inference of scienter, especially when their holdings increased during the class period); *cf. No. 84 Employer-Teamster Joint Council Pension Trust Fund v. America West Holding Corp.*, 320 F.3d 920, 938-39 (9th Cir. 2003) (sale by nine directors of between 88% -100% of their stock was dramatically out of line with their prior trading practices at times calculated to maximize the personal benefit from undisclosed inside information).

Robertson sold about a quarter of his $22 million in stock, taking home over 5½ million dollars.  That's a lot of money by most standards.  On the other hand, Robertson *kept* over $16 million in stock that later plunged along with everyone else's.  True, a savvy manipulator would not sell *all* his stock, lest he arouse suspicion; but just how much could our hypothetical con man sell to maximize his profit without actually tipping his hand?  Like Vizzini contemplating which goblet to choose in "The Princess Bride," it's possible to overthink this: maybe a half is too much, maybe even a third, but a fourth?  No.  An insider selling a quarter of his stock and taking a bath on the rest does not raise a strong inference of fraud.

To the extent that plaintiffs hope to press forward with the other statements they identifies in the complaint (found in block quotes), the ones not related to the 9-12 month backlog conversion cycle or the nature of the backlog are nothing more than "puffery," which is too vague to be material.  (Included in these statements are those such as "we have a lot of growth momentum," "we expect another strong year," "we are optimistic," etc.).  *Searles v. Glasser*, 64 F.3d 1061, 1066 (7th Cir. 1995).  Plaintiffs' halfhearted arguments to the contrary

42

appear in a footnote, Plt.'s Br., dkt. 31, at 55 n.35, and relate only to the backlog-related claims that have already been discussed.  Because I have concluded that plaintiffs' § 10(b) claims and related §§ 20(a) and 20A claims must be dismissed for plaintiffs' failure to plead scienter with particularity, I will not consider defendants' arguments that plaintiffs have also failed to adequately plead loss causation.

## IV. Conclusion

I will grant defendants' motion to dismiss as to plaintiffs' 1933 Act § 11 claims (and related § 15 claims) that defendants made false or misleading statements in the IPO and SPO prospectus by suggesting that the conversion cycle for a "majority" or a "significant majority" of the backlog would be converted to revenue within 9-12 months because there is no factual basis in the complaint from which an inference could be drawn that these statements were misleading.  In addition, I will grant defendants' motion to dismiss plaintiffs' 1934 Act § 10(b) claims (and related § 20(a) and § 20A claims) in their entirety because plaintiffs have failed to allege sufficient facts to give rise to a "strong inference" of scienter as required by the PSLRA.

Regarding dismissal of these claims, they will be without prejudice.  Defendants have moved for dismissal pursuant to Fed. R. Civ. P. 12(b)(6) and suggest that all claims should be dismissed with prejudice, but the ground for dismissing the 1933 Act claims was Fed. R. Civ. P. 8 (as I noted above) for failure to plead sufficient facts.  For the 1934 Act claims the grounds were Fed. R. Civ. P. 9(b) and the PSLRA, also for failure to plead sufficient facts.  Complaints dismissed for failure to plead sufficient facts under Rule 8 or Rule 9(b) are "almost always" dismissed with leave to amend, in accordance with the liberal amendment policy set forth in Fed.

R. Civ. P. 15(a).  *Luce v. Edelstein*, 802 F.2d 49, 56 (2ᵈ Cir. 1986).  Defendants do not suggest that dismissal pursuant to the PSLRA should be any different and I am not inclined to assume that the PSLRA allows plaintiffs only "one shot" to meet the high bar it sets.[9]

Therefore, I will dismiss both the 1933 Act claims I discussed above and the 1934 Act claims without prejudice to plaintiffs' amending his complaint to comply with Rule 8 (for the 1933 Act claims) and with the PSLRA and Rule 9(b) (for the 1934 Act claims).  If plaintiffs wish to amend their complaint to address the pleading defects, he must do so by July 30, 2009.  In that case, defendants would have until August 28, 2009 in which to file a motion to dismiss the second amended complaint.  The only amendments allowed, and the only arguments that will be considered in a new motion to dismiss, should relate to those 1933 Act and 1934 Act claims I have dismissed in this order.

Although it is likely that plaintiffs will attempt to amend their complaint to repair the pleading defects I have identified, I see no reason to keep the remaining 1933 Act claims stayed while awaiting the possible amendments.  If the parties disagree, they should notify the court promptly, with explanation.

---

[9]  Circuit courts have taken different positions on the question whether the PSLRA modifies the liberal amendment policy set out in Fed. R. Civ. P. 15(a).  Those who say  it does include the third circuit, *GSC Partners CDO Fund v. Washington*, 368 F.3d 228, 246 (3ᵈ Cir. 2004), and the sixth circuit, *Miller v. Champion Enterprises, Inc.*, 346 F.3d 660, 692 (6ᵗʰ Cir. 2003).  Those who say that the liberal amendment policy of Rule 15(a) still applies include the first circuit, *ACA Financial Guaranty Corp. v. Advest, Inc.*, 512 F.3d 46, 56 (2008), the ninth circuit, *Eminence Capital, LLC v. Aspeon, Inc.*, 316 F.3d 1048, 1052 (9ᵗʰ Cir.2003), and the D.C. circuit,  *Belizan v. Hershon*, 434 F.3d 579, 583-84 (D.C. Cir. 2006).  Because defendant does not argue that the PSLRA should be treated any differently than Rule 9(b) for dismissal purposes, that argument has been waived.  *United States v. Magana*, 118 F.3d 1173, 1198 n.15 (7ᵗʰ Cir. 1997) (arguments not raised in opening brief are waived).

ORDER

IT IS ORDERED that:

1.    The motion to dismiss filed by defendants TomoTherapy Incorporated, Frederick A. Robertson, M.D., T. Rockwell Mackie, Stephen C. Hathaway, Paul J. Reckwerdt, Michael J. Cudahy, John J. McDonough, John Neis, Cary J. Nolan, Carlos A. Perez, M.D. Sam R. Leno and Frances S. Taylor is GRANTED with respect to:

    a.    plaintiffs' claims that defendants violated §§ 11 and 15 of the Securities Act of 1933 by making statements in the Initial Public Offering and Secondary Public Offering prospectuses suggesting that a "majority" or a "significant majority" of the backlog would be converted to revenue within 9-12 months

    b.    plaintiffs' claims that defendants violated § 10(b) of the Securities Act of 1934;

Those claims are DISMISSED without prejudice to plaintiff's filing a second amended complaint repairing the pleading defects identified in this order by July 30, 2009.  If plaintiffs file a second amended complaint, defendants may have until August 28, 2009, in which to file and serve a motion to dismiss the second amended complaint.

2.    Defendants' motion to dismiss is DENIED with respect to plaintiffs' claims that defendants violated §§ 11 and 15 of the Securities Act of 1933 by making statements in the Initial Public Offering and Secondary Public Offering prospectuses suggesting that the backlog contained only "firm" or non-contingent orders.

Entered this 8th day of July, 2009.

BY THE COURT:

/s/

STEPHEN L. CROCKER
Magistrate Judge

45