IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

MICHAEL SCHULTZ, JOHN SCALA, HUUB VAN
ROOSMALEN, KIP KIRCHER, ROBERT H. WAKE and
LOUIS SPANBERGER, On Behalf of Themselves and
All Others Similarly Situated,

                         Plaintiffs,

    v.

TOMOTHERAPY INCORPORATED, FREDERICK A.
ROBERTSON,  T. ROCKWELL MACKIE, STEPHEN C.
HATHAWAY,  PAUL RECKWERDT, MICHAEL J. CUDAHY,
JOHN J. MCDONOUGH,  JOHN NEIS, CARY C. NOLAN,
CARLOS A. PEREZ, M.D., SAM R. LENO, and FRANCES S.
TAYLOR,

                         Defendants.

OPINION AND ORDER

08-cv-314-slc

08-cv-342-slc

---

      Before the court is defendants' motion to dismiss plaintiffs' second amended complaint[1].
For the reasons provided below, I am granting defendants' motion with respect to (1) plaintiffs'
'33 Act claims related to defendants' statements that a "majority" or a "significant majority" of
the backlog did or would convert to revenue within 12 months and that the backlog was a
"better measure" of the company's performance and (2) plaintiffs' '34 Act claims related to
defendants' statements that the backlog was a "better measure" of the company's performance
and provided "high visibility."   Also I am dismissing plaintiffs' '34 Act claims related to
defendants' statements *in the prospectus* that a "majority" or "significant majority" of the backlog
did or would convert to revenue within 12 months.  The same does not apply to similar
statements made outside the prospectus.

---

     [1] The operative pleading is plaintiffs' "Corrected Second Amended Consolidated Complaint," dkt.
42, as corrected by interlineation, dkt. 48.  For the sake of simplicity, I will refer to it as the second
amended complaint.

This case has been through one motion to dismiss already.  Originally, plaintiffs alleged that defendants violated the '33 Act and the '34 Act by making statements suggesting that a "majority" or "significant majority" of TomoTherapy's backlog would convert into revenue within 12 months and that the backlog contained only "firm" or "non-contingent" orders.  Defendants moved to dismiss plaintiffs' complaint, and in an order entered July 9, 2009 (the "first order"), I granted defendants' motion in large part.  Dkt. 36.[2]  I dismissed plaintiffs' '33 Act claim related to defendants' backlog "majority" statements, concluding that the statements could be misleading only if less than 50% of the backlog would convert, and plaintiffs' allegations did not allow this inference to be drawn.  I dismissed plaintiffs' '34 Act claims in their entirety, concluding that plaintiffs' allegations failed to establish the necessary scienter.  I declined to dismiss plaintiffs' '33 Act claim related to "firm" or "non-contingent" orders in the backlog, concluding that the allegations in the complaint reasonably allowed the inference that the backlog contained orders that were not "firm," and that the materiality of these statements could not be decided at this early stage.

Now comes round two.  Defendants contend that the additional allegations included in plaintiffs' second amended complaint still do not allow a plausible inference that less than a "majority" of any given backlog did or would convert within 12 months.  As for plaintiffs' '34 Act claims, defendants contend that plaintiffs have failed to plead a "strong inference of scienter" and "loss causation."[3]  In addition, defendants seek reconsideration of the conclusion

_____

[2]  All document references are to the docket in Case Number 08-cv-314-slc.

[3]  Defendants raised their arguments on loss causation in their briefs supporting their original motion to dismiss but it was unnecessary to decide that matter at that time.  Defendants renew those arguments.  Dfts.' Br., dkt. 55, at 11 n.9.

that plaintiffs state a claim under the '33 Act with respect to defendants' statements that the backlog contains only "firm" or "non contingent" orders, primarily on the ground that the allegedly misleading statements regarding the "firmness" of the backlog were immaterial.

The first order set out the basic allegations underlying plaintiffs' claims and I will not repeat them here, instead describing plaintiffs' new allegations in the analysis.

## ANALYSIS

### I. Securities Act of 1933 Claims

As I explained in the first order, for plaintiffs to proceed on their '33 Act claims, they must identify one or more registration statements that is false or misleading. 15 U.S.C. § 77k. Plaintiffs contend that three types of statements made in TomoTherapy's Initial Public Offering and Secondary Public Offering prospectuses were false or misleading: (1) that a "majority" or "significant majority" of certain of TomoTherapy's backlogs did or would convert into revenue within 12 months; (2) that the backlog included only "firm" orders, or did not include "contingent" orders; and (3) that the backlog provides a "better measure" of TomoTherapy's long-term performance.

### A. "Majority" or "Significant Majority" of Backlog Converting to Revenue

In the first order, I dismissed plaintiffs' '33 Act claim related to statements that a "majority" or "significant majority" of certain backlogs did or would convert into revenue within 12 months. Plaintiffs had identified only a few orders in the backlogs referenced in the IPO and SPO that did not or would not convert to revenue within 12 months. As I explained, delays in a few orders could not render misleading the statement that a "majority" of the orders in the

3

backlog would convert into revenue. Plaintiffs' second amended complaint includes new allegations detailing numerous orders in the backlogs referenced in the IPO and SPO that were not expected to or did not convert into revenue within 12 months. The complaint also alleges that defendants' unit orders were worth $3 million a unit and describes the total value of each of those backlogs. In response, defendants have used these allegations to generate charts (*see* dkt. 55-2, Exh. B) breaking out by percentage the amount of orders expected to be delayed in each quarterly backlog:

(1) December 31, 2006 backlog: 15%

(2) March 31, 2007 backlog: 13%

(3) June 30, 2007 backlog: 14%

(4) September 30, 2007 backlog: 25%

(5) December 31, 2007 backlog:  32%[4]

With respect to orders that allegedly took longer than 12 months to convert into revenue, plaintiffs identify 19 such orders as of March 31, 2007 and 23 such orders as of September 30, 2007. Although these orders were converted into revenue at different times across different quarterly backlogs, even if they were all present in the earliest backlogs identified, December 31, 2006 and March 31, 2007, they would represent only 35%-43% of those backlogs. Because more recent backlogs were larger, these orders would represent an even smaller percentage in any of these backlogs.

---

[4] Although plaintiffs contend that defendants' calculations are incorrect, they identify only one mistake: for December 31, 2007, defendants calculate the percentage to be 23%, and plaintiffs point out that this fails to include an additional 9% or so of additional orders described in ¶¶ 165(c) and (d) of the second amended complaint. I have accepted plaintiffs' calculation. Plts.' Opp. Br. , dkt. 62, at 30 n.30.

4

Plaintiffs' examples do not show why it would be false or misleading for defendants to state that a "majority" of each backlog would or did convert into revenue, understanding "majority" to mean "more than 50%." As for the statements that a "significant majority" of the backlog is expected to convert into revenue, these statements were made in reference to the December 2006 and March 2007 backlogs, for which the examples show that only 13-15% of the backlog was not expected to convert into revenue. Assuming that plaintiffs are correct that "significant" is not mere puffery, it would not be misleading to characterize 85% of the backlog as a "significant majority."

However, plaintiffs contend that "majority" should not be defined as merely "more than 50%," but rather should be defined as "95% or more." This definition would, of course, make every statement about backlog majorities false or misleading. The toehold supporting plaintiffs' argument is a statement that defendant Steve Hathaway made during a June 13, 2007 earnings conference call with an analyst:

> Analyst:     When you talk about the majority of backlog being converted in the next year, some of your competitors define their backlog being converted in a 60%, 65% [rate] over the next year, two-thirds of it, somewhere in there. What—how would you define just the majority when you talk about the majority being converted in a year?

> Hathaway:     I think the—when we did that calculation for the road show, it was about something like 95% of the orders coming in in the next 12 months and we haven't seen really any change to that. So I guess I'll go with that.

> Sec. Am. Cpt., ¶ 69.

5

However, as I explained in the first order, Hathaway's statement is irrelevant to the '33 Act claims because it occurred outside the IPO and SPO prospectuses.  The '33 Act addresses false or misleading *registration* statements.  Plaintiffs contend that Hathaway's out-of-registration statement can be considered because it defined "majority" as it was used in the IPO[5] and SPO prospectuses.  This argument fails. Any chance that the registration statements might have incorporated Hathaway's definition of "majority" is dispelled by the following language set out in both prospectuses:

> You should rely only on the information contained in this prospectus and any free riding prospectus prepared by or on our path. We have not, and the underwriters have not, authorized anyone to provide you with information different from, or in addition to that contained in this prospectus. If anyone provides you with different or inconsistent information, you should not rely on it.

> Dkts. 30-6, at 6 (IPO) and 30-10 at 6 (SPO).

In light of this cautionary language, the IPO and SPO prospectuses cannot be said to have created the impression that "95% or more" of the backlog did or would convert to revenue within 12 months.

Plaintiffs contend that even if they have not identified enough delayed orders to establish that less than a "majority" or "significant majority" of orders in any backlog did or would convert to revenue within 12 months, these are only *examples* of delayed orders, which should be enough to satisfy F.R. Civ. P. 8.  I disagree.  As the Supreme Court explains in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007) and *Ashcroft v. Iqbal*, ___ U.S. ___, 129 S.Ct. 1937

---

[5] Although the June 13 conference call occurred after the IPO, Hathaway states that defendants used the same calculation for the "road show," public presentations that occurred before the IPO.

6

(2009), Rule 8 requires a complaint to "state a claim to relief that is plausible on its face." *Iqbal*, 129 S.Ct. at 1949 (quoting *Twombly*, 550 U.S. at 570). Under this standard, the allegations in a complaint must raise a reasonable expectation that discovery will reveal evidence to support the claim, after all the conclusory statements in the complaint are stripped away. *Twombly*, 550 U.S. at 556; *Iqbal*, 129 S.Ct. at 1950. Plaintiffs' allegations do not meet this standard.

Regardless whether plaintiffs *might* be able to unearth additional delayed orders if they were able to perform discovery, nothing about the allegations in the complaint suggests that additional discovery could be expected to lead to those results. Had plaintiffs alleged, for example, that they had access to information regarding only half the orders in each backlog and nonetheless came up with these percentages, it would be reasonable to expect that discovery would reveal higher numbers, perhaps making it plausible that at least some of backlog "majority" statements were misleading. Nothing in the complaint suggests as much.

In sum, the allegations fail to establish plausible grounds to infer that the prospectus statements related to a "majority" or "significant majority" of the backlog were misleading under § 11 of the '33 Act. Therefore, I will grant defendants' motion to dismiss this claim.

B. **Backlog Containing only "Firm" or Non-Contingent Orders**

In the first order, I concluded that plaintiffs' '33 Act claim regarding the "firmness" of orders in the backlog met Rule 8 requirements. In particular, I concluded that defendants' statements that the backlog contained only "firm" or "non-contingent" orders created the impression the backlog represented orders merely waiting to be filled, while in reality the backlog included the Sagemark orders, which were at "serious risk of being cancelled." Dkt. 36, at 28. In addition, although defendants contended that the court could dismiss the claim because the

Sagemark orders were such a small part of the backlog that they were immaterial, I rejected that argument, concluding that it was too early to conclude that reasonable investors would have considered additional disclosures about the stability of the Sagemark orders "obviously unimportant" to their decision to invest in TomoTherapy.

Defendants contend once again that dismissal is warranted, adding minor twists to their original arguments on this question. First, they contend that the IPO prospectus statement that the backlog contained only "firm orders" was not misleading because the IPO prospectus defined the term "firm" as "evidenced by a signed quotation or purchase order from the customer, including the required down payment, if any."  As defendants point out, although the Sagemark orders appeared to include financing contingencies and a right to back down from a down payment, they involved a signed quotation or purchase order, and a down payment was not required for an order to be "firm." This is a perilous syllogism for defendants to advance[6] because a customer signature and perhaps a down payment are necessary but insufficient conditions to deem an order truly "firm" in this context.  A pulse and respiration are necessary but insufficient requirements for deeming a person "healthy": every patient in a hospital ICU is breathing and has a heartbeat, but none of them is healthy.  Defendants' use of the adjective "firm" implied that every signed order was fixed and definite.[7] If plaintiffs are correct that some of the orders were not fixed and definite, then defendants' statements that all of the backlog orders were "firm" was misleading.

_____

[6] (1) The IPO prospectus defines a firm order; (2) the Sagemark orders fit within this definition; (3) therefore the Sagemark orders were firm.

[7] www.freedictionary.com defines "firm" as:"1. Resistant to externally applied pressure; . . . 3. Securely fixed in place. . . . 5. Constant; steadfast.  *6.a. Not subject to change; fixed and definite: a firm bargain; a firm offer.  6.b.  Unfluctuating; steady: Stock prices are still firm.*"  (Emphasis added).

Next, defendants contend that dismissal is warranted because the statements classifying all backlog orders as "firm" or "non contingent" were immaterial.  First, they contend that the SPO prospectus statements were immaterial because in the SPO prospectus, backlog was not used to make predictions about future revenue.  Defendants are mistaken  Although the SPO prospectus did not state what amount of the backlog it expected to convert to revenue, it still implicitly predicted future revenue by pointing out that the majority of its backlog had historically been converted to revenue, identifying the amount currently in its backlog and stating that the orders were "firm" and not contingent.  Likewise, the SPO prospectus still pointed to the backlog as a way to measure TomoTherapy's "long-term performance."

Next, defendants contend that the statements were immaterial because the Sagemark orders made up a very small percentage of the backlog.  I rejected this argument in the First order, concluding that the question is better left for a later stage of the case.  However, defendants point out that I distinguished this case from *Parnes v. Gateway 2000, Inc.*, 122 F.3d 539, 550 (8th Cir. 1997) (company's overstatement of assets by 2% not material) in part on the ground that the percentage of impact is greater in this case.  Defendants now argue that the percentage is actually identical to *Parnes* because, although Sagemark orders made up 4 to 6% of the backlog, their contingency simply reduced their *likelihood* of conversion to revenue, not making it impossible that they would convert.  Thus, the true impact of the "shaky" Sagemark orders would be 2-3% (only three of the six orders were ultimately removed from the backlog).[8]

---

[8]  Although plaintiffs suggest that the backlog may have contained additional orders that would be considered "infirm" or contingent, these suggestions are grounded in their allegations that "all" orders ranked "C" for "iffy" were included in the backlog (no orders other than Sagemark orders are identified as "C"-ranked orders) and that "nobody held anybody to terms." Sec. Am. Cpt. ¶¶ 71, 106, 108.  Neither of these allegations suggests that orders other than Sagemark orders were unstable or subject to financing.

Assuming defendants are correct that investors would care about shaky orders only insofar as they approximate revenue, this still does not address the other fact I relied on to distinguish this case from *Parnes*:  TomoTherapy was considered a "young" company, which may have been a relevant factor for investors considering even the small amount of "shakiness" present in the backlog.  Once again, I will refrain from deciding at this early stage whether even the small percentage of the total order that Sagemark made up could be relevant to investors, particularly because this analysis is fact intensive.

Therefore, once again I will deny defendants' motion to dismiss with respect to plaintiffs' '33 Act claims related to IPO and SPO prospectus statements that the backlog contained only "firm" and "non contingent" orders.


C. **Backlog a "Better Measure" of Long-Term Performance**

The third group of allegedly misleading statements in the IPO and SPO prospectuses involves those statements that the backlog was a "better measure" of TomoTherapy's long-term performance.  According to plaintiffs, these statements were misleading because the backlog was "artificially inflated" with orders that contained contingencies and orders that would not convert within 12 months (some of this artificial inflation occurred right at the end of a backlog reporting period).  The problem is, the statement that the backlog is a "better measure" creates no false impression even if the backlog was artificially inflated.  Both prospectuses state that the backlog creates a "better measure" of the long-term performance than the quarterly results.  For this to be false or misleading, the backlog, as "artificially inflated," must be worse at measuring long-term performance than quarterly results.  At a first glance, it would seem that a backlog

containing contingent or delayed orders would be inferior to straight quarterly results, but not necessarily.  The prospectuses warned that quarterly results could fluctuate, a matter discussed a number of times by analysts and Hathaway during conference calls.  Moreover, these allegedly inflated backlogs still included at least a "majority" of units that converted into revenue within 12 months and contained only a small percentage of contingent orders.  The allegations do not include enough details about quarterly results estimates in comparison with backlog estimates to make it plausible to infer that the backlog was really not a  "better measure" of long-term performance.  Therefore, I will grant defendants' motion to dismiss with respect to these statements.

## III.  **Securities Exchange Act of 1934 Claims**

Plaintiffs' '34 Act claims relate to the same statements that are the subject of their '33 Act claims but also include several similar statements made outside the prospectuses.  Sec. Am. Cpt., dkt. 42, ¶¶ 31-34 (statements in IPO and SPO prospectuses); *id.*, ¶¶ 118-165 (other statements).  There are six elements to a '34 Act claim: "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation"  *Stoneridge Investment Partners, LLC v. Scientific-Atlanta*, 128 S. Ct. 761, 768 (2008) (citing *Dura Pharmaceuticals, Inc. v. Broudo*, 544 U.S. 336, 341-42 (2005)).  Defendants contend that the second amended complaint fails adequately to  plead material misrepresentation, scienter and loss causation.

11

A.  **Material Misrepresentations**

The question whether the statements at issue were "material misrepresentations" involves the same analysis as that involved in the '33 Act claims.   Thus, the statements that TomoTherapy's backlog contained only "firm" or "non contingent" orders suffice at this stage to allow an inference that they were "material misrepresentations."  In addition, for the same reason that the statements that the backlog provided a "better measure" failed in the context of a '33 Act claim, they fail in the context of a '34 Act claim.  With respect to the third group of statements, that a "majority" or "significant" majority of the backlog would or did convert within twelve months, the analysis differs, as I explain below.  In addition, plaintiffs identify one type of allegedly misleading statement that was not included in the prospectuses: that the backlog provided "high visibility as to where [TomoTherapy was] going."

1.  **"Majority" of Backlog**

Unlike plaintiffs' '33 Act claim, the '34 Act claim is not tied strictly to the terms of the prospectuses.  This point matters for deciding whether it was misleading for defendants to make statements about a "majority" of their backlog outside the prospectuses because plaintiffs allege facts suggesting that Hathaway "defined" "majority" in a very particular way: "95% or more." Although this would seem to be a strange way to define "majority," Hathaway had a reason for doing so.  During the June 2007 conference call, Hathaway provided that optimistic definition in response to a comparison of competitors' backlogs converting at a 60-65% rate.  Moreover, there is no suggestion that defendants attempted to retract that definition, at least until after the proposed class period ended.

12

Thus, unlike the statements made in the prospectuses (and relevant to the '33 Act claims), the statements made outside the prospectuses regarding a "majority" of the backlog could suggest "95% or more" of the backlog once defendants allegedly defined "majority" that way at the road show.  By allegedly failing to correct that definition, defendants failed to dispel the impression that "95% or more" of its backlog would or did convert to revenue in 12 months even though at no time was such a high percentage of backlog converted to revenue in 12 months.  Thus, the allegations are sufficient to allow an inference that defendants' statements outside the prospectuses about the "majority" (and "significant majority") of the backlog were misleading.  As for the materiality of the backlog "majority" statements, that question is better decided at a later stage of the case for the same reason that the materiality cannot be decided with respect to the "firm" or "non contingent" backlog statements.

## 2. "High Visibility"

Plaintiffs contend that defendants made material misrepresentations when they stated that the backlog gave a "high visibility" of the company's direction because the backlog was artificially inflated.  Assuming the term "high visibility" was more than mere "puffery" and could be assigned a particular meaning, the fact that the backlog was "artificially inflated" by some amount does not make it misleading to state that it gives "high visibility" of the company's direction.  The artificial inflation of the backlog suggests only that the backlog did not give *perfect* visibility.  Because plaintiffs have failed to allege facts that would suggest that the backlog was "artificially inflated" by a large number of orders that were not likely to convert into revenue, it is not plausible to infer that the backlogs did not provide "high visibility" as to the direction of the company.

B. **Strong Inference of Scienter**

In the First order, I concluded that plaintiffs had failed adequately to plead scienter. Plaintiffs' allegations may have suggested that defendants were aware of orders in the backlog and even perhaps that they knew that the Sagemark orders were contingent, but there was no basis to infer that they were aware of how much of the backlog would convert too slowly and with respect to the Sagemark orders, the more compelling inference with respect to the Sagemark orders was that "hungry" salespeople set up the Sagemark orders, not defendants.

As I explained in the First order, scienter is "a mental state embracing intent to deceive, manipulate or defraud," *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 127 S. Ct. 2499, 2507 (2007), that requires either actual knowledge that a statement is false or misleading or at least reckless disregard of the truth, *S.E.C. v. Jakubowski*, 150 F.3d 675, 681 (7th Cir. 1998). A "strong inference" of scienter is one that is "at least as compelling as any [possible] opposing inference," from the perspective of a "reasonable person. *Tellabs*, 127 S. Ct. at 2510.

In this case, the only claims that plaintiffs have sufficiently alleged to be false or misleading are those statements about the "firmness" of the backlog orders and the conversion of the "majority" of the backlog. Therefore, I consider the question of scienter only with respect to those statements. Before I decide the question of scienter, however, I must address the parties' disputes regarding the materials that should be considered for that purpose. Plaintiffs allege facts drawn from company documents they have not attached to their complaint and from interviews with former TomoTherapy employees. Defendants contend that the allegations drawn from the documents should be discounted and that additional testimony provided during the interviews must be considered for completeness.

14

As to the documents, defendants explain that, because plaintiffs have not attached the documents, it is impossible to determine whether the documents are accurate and say exactly what plaintiffs allege they say. However, even under the PSLRA, plaintiffs are not required to attach all their evidence to their complaint for defendants' scrutiny. 15 U.S.C. § 78u-4(b)(2) (requiring only that plaintiffs "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind."). Therefore, plaintiffs' failure to append the documents is not a basis to disregard statements culled from them.

As to whether defendants should be allowed to submit additional testimony, the answer is "it depends." If plaintiffs were to have pulled the interviewees' statements out of context so as to imply a meaning not intended by the speak, then defendants should be allowed to provide whatever context would be necessary to establish what the speaker actually meant to say. *E.g.,* *Cancer Foundation, Inc. v. Cerberus Capital Management, LP*, 559 F.3d 671, 675 (7th Cir. 2009) (court of appeals reviews article plaintiff relies on in complaint and disregards plaintiffs' mischaracterization of article, explaining that article was "central component of the complaint").

The answer would be different, however, if defendants were to offer the additional material for the purpose of calling into doubt the weight and reliability of statements accurately recounted by plaintiffs. This is what defendants are attempting here. Defts.' Br., dkt. 55, at 3-10. For example, in response to plaintiffs' allegation that "nobody held anybody to terms," defendants point out that the interviewee never saw the terms; in response to plaintiffs' allegation that "everything" or "a lot" of approved contingencies had to go through Hathaway and that nonstandard terms and conditions were "reviewed and okayed," defendants point out that the interviewee did not have a general understanding of how TomoTherapy ultimately

15

signed off on the terms and conditions; in response to statements that multi-unit orders were subject to a "materially different revenue cycle," defendants point out that the interviewee stated that "every multi-unit order was different"; and, to rebut more generally the notion that defendants acted fraudulently, defendants point out that the interviewee stated that defendant Robertson "didn't want to be lying to the stockholders" and that he did not think there were any nefarious reasons for the company's decision to seal certain meetings. These points will be relevant when facts have to be found; they are not relevant now. Even if it were proper to consider these statements not included in the complaint, they wouldn't achieve defendants' intended goal because at this stage, the facts must be viewed in the light most favorable to plaintiffs.

Turning to the allegations, I conclude that they suffice to establish the required "strong inference" of scienter. Plaintiffs allege that defendants received a weekly "Backlog List" by email that included information such as each current and potential order's site, purchase order date, install start date, ship status and date the "ATP" was to be signed (at which time the customer would be required to pay for the order). The deals listed in the Backlog List were categorized as "A," "B" or "C," according to the certainty of completing the sale: "A" meant "solid sale," "B" meant "50-75% confidence level" and "C" meant "at risk" or "kind of iffy." Defendants also attended weekly "Backlog Meetings," during which the list would be reviewed. The delays in the Sagemark orders and Sagemark's financial problems were topics at more than one of the weekly Backlog Meetings. The Sagemark orders were "always" in the "C" category. Defendant Hathaway would use the list to report to shareholders. All the deals, ranging from A to C, were in the list reported to shareholders. These allegations sufficiently support an inference that the

defendants knew quite well what was in the backlog, including approximately how many orders in the backlog would convert to revenue within 12 months and how "firm" each order was.

### C. **Loss Causation**

To prevail on their '34 Act claim, plaintiffs ultimately must show not only that a knowledgeable investor would not have invested in TomoTherapy had s/he known all the facts, but also that plaintiffs suffered a loss because of the alleged fraud. *E.g.*, *Ray v. Citigroup Global Markets, Inc.*, 482 F.3d 991, 995 (7th Cir. 2007). One way to prove loss causation is "fraud-on-the-market," in which case "the plaintiff must show both that the defendants' alleged misrepresentations artificially inflated the price of the stock and that the value of the stock declined once the market learned of the deception." *Id.* This is plaintiffs' theory and they point to statements that defendants made on April 17, 2008 as the moment that the "market learned of the deception" and stock values took a hit. Defendants contend that plaintiffs have failed to show loss causation, arguing that the April 17 statements did not reveal the alleged fraud and that stock values dropped because of the revelation of the company's "lower sales numbers," not its deception.

The parties quarrel over what standard governs review of this aspect of the complaint. According to plaintiffs, all that is required at this stage is that they allege "a plausible theory connecting [the] omission to its loss." Plts.' Orig. Opp. Br., dkt. 31, at 57 (citing *Caremark, Inc. v. Coram Healthcare Corp.*, 113 F.3d 645, 649 (7th Cir. 1997)). Defendants argue that this "plausible theory" standard no longer controls following *Dura Pharmaceuticals, Inc. v. Broudo*, 544 U.S. 336, 346-48 (2005). As defendants point out, the Court of Appeals for the Seventh Circuit

has held that, under *Dura*, it is not enough that a misrepresentation merely "touc[h] upon a later economic loss." *Tricontinental Industries, Ltd. v. PricewaterhouseCoopers, LLP*, 475 F.3d 824, 843 (7th Cir. 2007). The parties' positions are not necessarily inconsistent: a complaint that does no more than identify a misrepresentation that "merely touches upon" a loss does not provide a "plausible theory connecting" the misrepresentation and the loss. That said, I agree with defendants that *Tricontinental* more concretely identifies what is required sufficiently to plead a fraud-on-the-market loss: plaintiffs must identify statements occurring around the time of the alleged loss that would have made the misrepresentations at issue "generally known." *Id.* (affirming dismissal of plaintiffs' '34 Act claim because plaintiff failed to identify any statements that would have made material misrepresentations "generally known").

Applying this standard to the alleged "revelation" identified by plaintiffs leads to a mixed result. I conclude that plaintiffs adequately have pled a fraud-on-the-market loss with respect to the alleged misleading statements about the conversion time for a "majority" of the backlog but not with respect to the statements about the "contingency" of the backlog. With respect to the backlog "majority" statements, plaintiffs have identified statements that occurred at the time of the alleged loss that could have made it "generally known" that less than 95% of the backlog did or would convert to revenue. Plaintiffs allege that in an April 17, 2008 press release, TomoTherapy stated that it expected a loss for its first quarter revenue and that it would be lowering its annual guidance for 2008. It explained that its first quarter results were lower than anticipated because it saw "a further shift of customer system deliveries." In addition, TomoTherapy stated that a "key contributing factor to the delivery shifts is that a growing

18

portion of TomoTherapy's backlog consisted of multi-unit orders for which the units are installed sequentially, causing some orders to remain in backlog longer.

After the press release, defendants Robertson and Hathaway made additional statements during a conference call.  Defendant Robertson stated that there were "two primary issues" impacting TomoTherapy's first quarter and annual guidance: more multiunit orders in the backlog and unanticipated sluggishness in Europe.  Robertson repeated that defendants were seeing a "delivery shift" in the timing of installations, a contributing factor being the growing portion of multi-unit orders in the backlog.  After an analyst asked how much of the "revenue miss" was attributable to "disappointment on order flow" and how much on "delivery timing," Robertson stated that the "biggest impact is going to be this increasing number of multiunit systems that are in the backlog."  Defendant Hathaway added that TomoTherapy had gone from almost no multi-unit orders in its backlog to "about a third."  One day later, the price of TomoTherapy's stocks "plunged" by about 32% and trading volume was "extraordinar[ily]" high, leading to a loss of $213 million in market value in one day.

Although defendants' statements do not reveal specifically that less than 95% of the backlog did or would convert within 12 months, it is plausible to infer that this fact nonetheless became "generally known" on April 17, 2008 when defendants revealed that the "biggest impact" on their "revenue miss" was related to increasing numbers of multi-unit orders remaining longer in the backlog and that such orders then made up "about a third" of the backlog.  Simple arithmetic would demonstrate the vulnerability of a 95% one-year conversion rate to such a high ratio of slower multiple orders in the backlog.

19

However, plaintiffs' allegations do not allow an inference to be drawn that any of defendants' statements made "generally known" the fact that the backlog orders had not been "firm" as represented.  Plaintiffs allege only that on April 17, 2008, defendants revealed that TomoTherapy had to reverse three of the Sagemark orders out of its backlog because Sagemark made an "announcement that they were exiting the diagnostic imaging and radiation therapy business due to their 'internal financial issues.'"  Alone, this statement does not make "generally known" that the Sagemark orders previously had not been "firm."  The fact that Sagemark fell on hard times did not broadcast that its orders had  never been any good or that defendants should not have labeled them "firm."  Indeed, as plaintiffs allege, along with the flagged statement, defendants added that the backlog reversals were not caused by "credit or people not paying."  Plaintiffs' allegations fail to support a plausible inference that their losses were caused by defendants' alleged misrepresentation that the backlog order contained only "firm orders."

Plaintiffs argue that to the extent their fraud-on-the-market theory fails, they can proceed under a "materialization of risk" theory.  Under this theory, a plaintiff must allege that "but for the circumstances that the fraud concealed, the investment . . . would not have lost its value." *Caremark*, 113 F.3d at 648-49 (quoting *Bastian v. Petren Resources Corp.*, 892 F.2d 680, 683 (7th Cir. 1990)).  Such but-for causation is established when a misrepresentation causes an undervaluation of risk related to the misrepresentation (and thus causes an overvaluation of the stock). *Caremark*, 113 F.3d at 650, n.6.  Defendants contend that plaintiffs cannot rely on this theory because they failed to plead it.  However, a plaintiff is not required to plead legal theories, *Bartholet v. Reishauer A.G. (Zurich)*, 953 F.2d 1073, 1078 (7th Cir. 1992), only facts that support a given theory.  Plaintiffs do allege those facts, describing how defendants "artificially inflated"

TomoTherapy's backlog and then "touted" it, suggesting a false certainty about the revenue it would receive.  From these allegations, it is plausible to infer that, to one degree or another, defendants' statements related to the "firmness" of TomoTherapy's backlog and the conversion rate of the "majority" of the backlog caused an undervaluation of the risk related to investing in TomoTherapy.

Next, defendants argue that plaintiffs, by alleging that there was a fraud-on-the-market, have undermined any "materialization of risk theory."  It is not clear why defendants believe that these two theories are incompatible; they seem to argue that because plaintiffs allege that *market forces* lowered the value of the stock in response to the revelation of defendants' fraud, it is impossible for the stock to have depreciated in value because an undervalued risk materialized. Not so.  The allegations support either possibility.  On one hand, the April 18 plunge in stock prices may have been caused by investors' reactions to the revelations; on the other, the plunge may have been caused by investors' reactions to the reduced quarterly results that were disclosed, a manifestation of the undisclosed risk materializing.

### III. Conclusion

I will grant defendants' motion to dismiss plaintiffs' '33 Act § 11 claims (and related § 15 claims) related to allegedly false or misleading statements in the IPO and SPO prospectus that the conversion cycle for a "majority" or a "significant majority" of the backlog did or would convert to revenue within 9-12 months and that the backlog was a "better measure" of the company's performance.  There is no factual basis in the complaint from which an inference could be drawn that these statements were misleading.  For the same reason, I will grant defendants' motion to dismiss plaintiffs' '34 Act § 10(b) claims (and related § 20(a) and § 20A

claims) related to defendants' allegedly material misrepresentations that the backlog was a "better measure" of the company's performance and provided "high visibility" as to where the company was going and with respect to the statements in the prospectuses that a "majority" or "significant majority" of the backlog did or would convert to revenue within 9-12 months.

This is the second time that I have dismissed plaintiffs' claims related to the statements about the "majority" and "significant majority" of the backlog, so I am dismissing those claims with prejudice. *Airborne Beepers & Video, Inc. v. AT&T Mobility LLC*, 499 F.3d 663, 666-67 (repeated failure to remedy same pleading deficiency warrants dismissal with prejudice). As to the '33 and '34 act claims related to the backlog as a "better measure" and the '34 Act claims related to the backlog providing "high visibility," I am dismissing these claims without prejudice, but at this stage I will not *sua sponte* grant leave to amend the complaint because at this point defendants may well be able to establish that they would be prejudiced by yet another round of pleadings. It is time to move this case to the next stage. *See id.* at 667 (delay coupled with prejudice may be grounds for denial of leave to amend).

I am denying defendants' motion to dismiss in all other respects.

22

ORDER

IT IS ORDERED that:

1.   Defendants' motion to dismiss plaintiffs' corrected second amended consolidated
     complaint, dkt. 54, is GRANTED with respect to:

> a.   plaintiffs' claims that defendants violated §§ 11 and
>      15 of the Securities Act of 1933 by making
>      statements in the Initial Public Offering and
>      Secondary Public Offering prospectuses suggesting
>      that a "majority" or a "significant majority" of the
>      backlog did or would convert to revenue within 12
>      months and that the backlog was a "better measure"
>      of the company's performance; and
>
> b.   plaintiffs' claims that defendants violated § 10(b) of
>      the Securities Act of 1934 by making statements
>      that the backlog was a "better measure" of the
>      company's performance and provided "high
>      visibility" and by making statements within the
>      prospectus that a "majority" or "significant
>      majority" of the backlog did or would convert to
>      revenue within 12 months.

2.   Plaintiffs' claims that defendants violated §§ 11 and 15 of the Securities Act of 1933 and
     § 10(b) of the Securities Act of 1934 by making statements in the prospectus that a
     "majority" or "significant majority" of the backlog did or would convert to revenue
     within 12 months are DISMISSED with prejudice for failure to state a claim upon which
     relief may be granted.  The '33 Act and '34 Act claims involving statements that the
     backlog was a "better measure" of the company's performance and the '34 Act claims
     involving statements that the backlog provided "high visibility" are DISMISSED without
     prejudice.

3.   Defendants' motion to dismiss is DENIED with respect to all other claims.


Entered this 14th day of December, 2009.

                              BY THE COURT:

                              /s/

                              STEPHEN L. CROCKER
                              Magistrate Judge