## UNITED STATES DISTRICT COURT FOR THE
## WESTERN DISTRICT OF WISCONSIN

MICHAEL SCHULTZ, JOHN SCALA,
HUUB VAN ROOSMALEN, KIP KIRCHER,
ROBERT H. WAKE, and LOUIS
SPANBERGER, On Behalf of Themselves and
All Others Similarly Situated,

        PLAINTIFFS,

           v.

TOMOTHERAPY INCORPORATED,
FREDERICK A. ROBERTSON, T.
ROCKWELL MACKIE, STEPHEN C.
HATHAWAY, PAUL RECKWERDT,
MICHAEL J. CUDAHY, JOHN J.
MCDONOUGH, JOHN NEIS, CARY C.
NOLAN, CARLOS A. PEREZ, M.D., SAM R.
LENO, and FRANCES S. TAYLOR,

        DEFENDANTS.

08-CV-00314-SLC

08-CV-00342-SLC

---

## PLAINTIFFS' MEMORANDUM OF LAW IN
## SUPPORT OF MOTION FOR CLASS CERTIFICATION

---

## TABLE OF CONTENTS

I.     PRELIMINARY STATEMENT ......................................................................2

II.    STATEMENT OF FACTS ........................................................................3

    A.    Background ..................................................................................3

    B.    The Offerings ...............................................................................4

    C.    Misstatements During the Class Period ...................................................5

    D.    The Truth Is Revealed .....................................................................6

III.   PROCEDURAL HISTORY .......................................................................7

IV.   ARGUMENT ...................................................................................9

    A.    Courts Favor Class Treatment of Securities Fraud Class Actions .........................9

    B.    This Action Satisfies the Standards for Class Certification Under Fed. R.
          Civ. P. 23(a) ...............................................................................12

          1.    The Classes are So Numerous that Joinder of All Members is
                 Impracticable .................................................................12

          2.    There are Questions of Law and Fact Common to Each Member of
                 the Proposed Classes ...........................................................14

          3.    Plaintiffs' Claims Are Typical of Those of the Classes ...........................18

          4.    Plaintiffs Will Fairly and Adequately Represent the Classes ...................20

    C.    The Conditions of Rule 23(b)(3) Are Satisfied by the Proposed Classes ............25

          1.    Common Questions of Law and Fact Predominate Over Individual
                 Issues With Respect to Plaintiffs' Sections 11 and 15 Claims ................26

          2.    Common Questions of Law and Fact Predominate Over Individual
                 Issues With Respect to Plaintiffs' Sections 10(b) and 20(a) Claims ........27

                a.    Plaintiffs Have Established Their Entitlement to Utilize the
                        Fraud-on-the-Market Theory ........................................30

          3.    A Class Action is Superior to Other Available Methods for the Fair
                 and Efficient Adjudication of this Action ...................................36

V.    Conclusion ...............................................................................39

# TABLE OF AUTHORITIES

## CASES

*Abrams v. Van Kampen Funds, Inc.*,
   2002 WL 1989401 (N.D. Ill. Aug. 27, 2002) ........................................................... *passim*

*Amchem Prods. v. Windsor*,
   521 U.S. 591 (1997)............................................................................................................38

*Basic Inc. v. Levinson*,
   485 U.S. 224 (1988)............................................................................................... *passim*

*Beale v. Edgemark Fin. Corp.*,
   164 F.R.D. 649 (N.D. Ill. 1995)........................................................................................28

*Cammer v. Bloom*,
   711 F. Supp. 1264 (D.N.J. 1989) ................................................................32, 33, 34, 35

*Cent. Cmty. Church of God v. Ent & Imler CPA Group, PC*,
   2005 U.S. Dist. LEXIS 8679 (S.D. Ind. May 9, 2005)................................................29, 38

*Cortese v. Radian*,
   Civil Action No. 07-3375 (E.D. Pa. Jan. 30, 2008) ..........................................................25

*DeMaria v. Andersen*,
   318 F.3d 170 (2d Cir. 2003)...............................................................................................19

*Eisen v. Carlisle & Jacquelin*,
   417 U.S. 156 (1974)............................................................................................................11

*Friedland v. Coastal Healthcare Group*,
   1996 U.S. Dist. LEXIS 16088 (M.D.N.C. Sept. 12, 1996)...............................................30

*Friedman v. Rayovac Corp.*,
   295 F. Supp. 2d 957 (W.D. Wis. 2003) ...........................................................................26

*Gammon v. GC Servs. Ltd. P'ship*,
   162 F.R.D. 313 (N.D. Ill. 1995)........................................................................................22

*Gariety v. Grant Thornton, LLP*,
   368 F.3d 356 (4th Cir. 2004), *cert denied*, 129 S. Ct. 652 (2008)...................................33

*Gavin v. AT&T Corp.*,
   2004 WL 2260632 (N.D. Ill. Sept. 30, 2004) ...................................................................13

*Gilbert v. First Alert, Inc.*,
   904 F. Supp. 714 (N.D. Ill. 1995) .....................................................................................10

*Grossman v. Waste Mgmt., Inc.*,
    100 F.R.D. 781 (N.D. Ill. 1984)................................................................................10

*Harman v. LyphoMed, Inc.*,
    122 F.R.D. 522 (N.D. Ill. 1988)................................................................................16

*Herbst v. Able*,
    47 F.R.D. 11 (S.D.N.Y. 1969) ("to the extent plaintiffs' claims in these three
    actions arise only under Section 11 of the Securities Act of 1933, 15 U.S.C.
    §77k, individual reliance is not an issue and class actions are particularly
    appropriate.") ...........................................................................................................27

*Hochschuler v. G.D. Searle & Co.*,
    82 F.R.D. 339 (N.D. Ill. 1978)................................................................................16

*Hubler Chevrolet, Inc. v. GMC*,
    193 F.R.D. 574 (S.D. Ind. 2000)..............................................................................29

*In re Accredo Health, Inc. Sec. Litig.*,
    2006 U.S. Dist. LEXIS 97621 (W.D. Tenn. Mar. 7, 2006) ....................................9, 31, 33

*In re Anicom Inc. Sec. Litig.*,
    2002 U.S. Dist. LEXIS 5575 (N.D. Ill. Mar. 26, 2002)............................................10

*In re Bank One Sec. Litig./First Chicago S'holder Claims*,
    2002 U.S. Dist. LEXIS 8709 (N.D. Ill. May 9, 2002) .............................................. *passim*

*In re BearingPoint, Inc. Sec. Litig.*,
    232 F.R.D. 534 (E.D. Va. 2006) ..............................................................................30

*In re Career Educ. Corp.*,
    2007 WL 1029092 (N.D. Ill. Mar. 29, 2007)...........................................................13

*In re Direct Gen. Corp. Sec. Litig.*,
    2006 U.S. Dist. LEXIS 56128 (M.D. Tenn. Aug. 8, 2006) ................................9

*In re DVI Inc. Sec. Litig.*,
    249 F.R.D. 196 (E.D. Pa. 2008) ("*DVI*")................................................................31, 32, 33

*In re Dynegy, Inc. Sec. Litig.*,
    226 F.R.D. 263 (S.D. Tex. 2004)..............................................................................39

*In re Enron Corp. Sec., Derivative & ERISA Litig.*,
    586 F. Supp. 2d 732 (S.D. Tex. 2008) ....................................................................23, 24

*In re First Merchs. Acceptance Corp. Sec. Litig.*,
    1998 U.S. Dist. LEXIS 17760 (N.D. Ill. Nov. 2, 1998) ..........................................26

*In re Gen. Instrument Corp. Sec. Litig.*,
    1999 WL 1072507 (N.D. Ill. Nov. 18, 1999) .........................................................10, 12

*In re Guidant Corp. Sec. Litig.*,
    536 F. Supp. 2d 913 (S.D. Ind. 2008), *aff'd*, 583 F.3d 995 (7th Cir. 2009) .....................13

*In re Hartmarx Sec. Litig.*,
    2002 WL 31103491 (N.D. Ill. Sept. 19, 2002) .....................................................14, 15, 36

*In re HealthSouth Corp. Sec. Litig.*,
    257 F.R.D. 260 (N.D. Ala. 2009).....................................................................................31

*In re Initial Public Offering Sec. Litig.*,
    243 F.R.D. 79 (S.D.N.Y. 2007) ......................................................................................20

*In re Loewen Group Sec. Litig.*,
    233 F.R.D. 154 (E.D. Pa. 2005)........................................................................................9

*In re MIVA, Inc. Sec. Litig.*,
    2008 U.S. Dist. LEXIS 21108 (M.D. Fla. Mar. 12, 2008) .................................................9

*In re Neopharm, Inc. Sec. Litig.*,
    225 F.R.D. 563 (N.D. Ill. 2004)............................................................................... *passim*

*In re PolyMedica Corp. Sec. Litig.*,
    432 F.3d 1 (1st Cir. 2005) ("*PolyMedica II*")..................................................................33

*In re PolyMedica Corp. Sec. Litig.*,
    453 F. Supp. 2d 260 (D. Mass. 2006) ("*PolyMedica I*") ......................................31, 33, 34

*In re PS Group Inc., Sec. Litig.*,
    1993 WL 477926 (C.D. Ill. Aug. 6, 1993)........................................................................29

*In re Qwest Commc'ns Int'l, Inc. Sec. Litig.*,
    625 F. Supp. 2d 1143 (D. Colo. 2009) .............................................................................24

*In re Retek, Sec. Litig.*,
    236 F.R.D. 431 (D. Minn. 2006)........................................................................................9

*In re Scientific-Atlanta, Inc. Sec. Litig.*,
    571 F. Supp. 2d 1315 (N.D. Ga. 2007) ..............................................................................9

*In re Sys. Software Assocs., Inc. Sec. Litig.*,
    2000 WL 1810085 (N.D. Ill. Dec. 8, 2000)............................................................. *passim*

*In re Worldcom, Inc. Securities Litigation*
    219 F.R.D. 267, 302 (S.D.N.Y. 2003) .............................................................................28

*In re Xcelera.com Sec. Litig.*,
    430 F.3d 503 (1st Cir. 2005) ("*Xcelera.com*").............................................................33, 34

*Jaffe v. Household Int'l, Inc.*,
    No. 02-05893 (N.D. Ill. May 7, 2009) .............................................................................24

iv

*King v. Kansas City S. Indus., Inc.*,
    519 F.2d 20 (7th Cir. 1975) ....................................................................................9

*Krim v. PCOrder.com, Inc.*,
    402 F.3d 489 (5th Cir. 2005) ...............................................................................19

*Krogman v. Sterritt*,
    202 F.R.D. 467 (N.D. Tex. 2001) .........................................................................33

*Lehocky v. Tidel Techs., Inc.*,
    220 F.R.D. 491 (S.D. Tex. 2004) ("*Lehocky*") .................................................33

*Levitan v. McCoy*,
    2003 WL 1720047 (N.D. Ill. Mar. 31, 2003)....................................................9, 10, 12

*Loeb Indus., Inc. v. Sumitomo Corp.*,
    306 F.3d 469 (7th Cir. 2002) ...............................................................................11

*Mace v. Van Ru Credit Corp.*,
    109 F.3d 338 (7th Cir. 1997) ...............................................................................38

*Makor Issues & Rights, Ltd. v. Tellabs, Inc.*,
    256 F.R.D. 586 (N.D. Ill. 2009) ("*Makor*")............................................ *passim*

*Makor Issues & Rights, Ltd. v. Tellabs, Inc.*,
    437 F.3d 588 (7th Cir. 2006) ...............................................................................27

*Markham v. White*,
    171 F.R.D. 217 (N.D. Ill. 1997).............................................................................14

*Miller v. Material Scis. Corp.*,
    1999 U.S. Dist. LEXIS 10628 (N.D. Ill. June 25, 1999) .....................................10

*Odmark v. Mesa Ltd. P'ship*,
    1992 U.S. Dist. LEXIS 16789 (N.D. Tex. June 5, 1992) ....................................18

*Oscar Private Equity Invs. v. Allegiance Telecom, Inc.*,
    487 F.3d 261 (5th Cir. 2007) ...............................................................................28

*Phillips Petroleum Co. v. Shutts*,
    472 U.S. 797 (1985)........................................................................................38, 39

*Pope v. Harvard Bancshares, Inc.*,
    240 F.R.D. 383 (N.D. Ill. 2006).............................................................................10

*Retsky Family Ltd. P'ship v. Price Waterhouse LLP*,
    1999 U.S. Dist. LEXIS 11351 (N.D. Ill. July 21, 1999)......................................10

*Riordan v. Smith Barney*,
    113 F.R.D. 60 (N.D. Ill. 1986)...............................................................................14

*Rosario v. Livaditis*,
    963 F.2d 1013 (7th Cir. 1992) ...................................................................15, 20

*Roth v. Aon Corp.*,
    238 F.R.D. 603 (N.D. Ill. 2006)..............................................................10, 15

*Ruppert v. Alliant Energy Cash Balance Pension Plan*,
    255 F.R.D. 628 (W.D. Wis. 2009) ..................................................................12

*Schleicher v. Wendt*,
    2009 U.S. Dist. LEXIS 24810 (S.D. Ind. Mar. 20, 2009)......................... *passim*

*Silverman v. Motorola, Inc.*,
    259 F.R.D. 163 (N.D. Ill. 2009)..................................................................... *passim*

*Sutton v. Bernard*,
    2001 U.S. Dist. LEXIS 21300 (N.D. Ill. Dec. 17, 2001)...................................10

*Swack v. Credit Suisse First Boston*,
    230 F.R.D. 250 (D. Mass. 2005).......................................................................9

*Swanson v. Am. Consumer Indus. Inc.*,
    415 F.2d 1326 (7th Cir. 1969) ........................................................................14

*Szabo v. Bridgeport Machs., Inc.*,
    249 F.3d 672 (7th Cir. 2001) ..........................................................................11

*Tatz v. Nanophase Techs. Corp.*,
    2003 WL 21372471 (N.D. Ill. June 13, 2003) ........................................ *passim*

*Tylka v. Gerber Prods. Co.*,
    178 F.R.D. 493 (N.D. Ill. 1998).......................................................................15

*Unger v. Amedisys Inc.*,
    401 F.3d 316 (5th Cir. 2005) ..........................................................................31

*Wagner v. Barrick Gold Corp.*,
    251 F.R.D. 112 (S.D.N.Y. 2008) ...............................................................31, 33

*Wagner v. Nutrasweet Co.*,
    95 F.3d 527 (7th Cir. 1996) ............................................................................19

*Weiner v. Quaker Oats Co.*,
    1999 U.S. Dist. LEXIS 17222 (N.D. Ill. Sept. 28, 1999) .................................10

*Weiss v. Tenney Corp.*,
    47 F.R.D. 283 (S.D.N.Y. 1969) .......................................................................27

Lead Plaintiffs Michael Schultz ("Schultz"), John Scala ("Scala"), Huub Van Roosmalen ("Van Roosmalen"), Kip Kircher ("Kircher"), and additional Plaintiffs Robert H. Wake ("Wake"), and Louis Spanberger ("Spanberger") (collectively, "Plaintiffs"), pursuant to Fed. R. Civ. P. 23 ("Rule 23"), respectfully submit this memorandum of law in support of Plaintiffs' Motion for Class Certification (the "Motion"). Plaintiffs seek to certify this action as a class action on behalf of three classes:[1] (1) a 10b-5 class comprised of all persons and entities who purchased or otherwise acquired the common stock of TomoTherapy Incorporated ("TOMO" or the "Company") between May 9, 2007 and April 17, 2008, inclusive (the "Class Period"), and who were damaged thereby, and assert claims under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act") and Rule 10b-5 promulgated thereunder (the "10b-5 Class"); (2) a Section 11 class comprised of all persons and entities who acquired shares of TOMO's common stock pursuant or traceable to the Initial Public Offering Registration Statement and Prospectus (collectively, the "IPO Documents") issued in connection with TOMO's May 9, 2007 Initial Public Offering ("IPO"), and were damaged thereby, and assert claims under Section 11 and Section 15 of the Securities Act of 1933 (the "Securities Act") (the "IPO Class"); and (3) a Section 11 class comprised of all persons and entities who acquired shares of TOMO's common stock pursuant or traceable to the Secondary Public Offering Registration Statement and Prospectus (collectively, the "SPO Documents") issued in connection with TOMO's October 16, 2007 Secondary Public Offering ("SPO"), and were damaged thereby, and assert claims under Sections 11 and 15 of the Securities Act (the "SPO Class") (collectively, the "Classes").[2]

---

[1]     The Class definitions for the three Classes are set forth in the Motion.

[2]     Excluded from the Classes are Defendants TOMO, Frederick A. Robertson, M.D. ("Robertson"), T. Rockwell Mackie ("Mackie"), Stephen C. Hathaway ("Hathaway"), Paul J. Reckwerdt ("Reckwerdt"), Michael J. Cudahy ("Cudahy"), John J. McDonough ("McDonough"), John Neis ("Neis"), Cary C. Nolan ("Nolan"), Carlos A. Perez, M.D. ("Perez"), Sam R. Leno

Additionally, Plaintiffs request to be appointed as Class Representatives. Specifically, Plaintiff Spanberger seeks to be appointed as Class Representative for the IPO Class, Plaintiff Van Roosmalen seeks to be appointed Class Representative for the SPO Class, and Plaintiffs collectively seek to be appointed as Class Representatives for the 10b-5 Class. Finally, Plaintiffs request that Lead Counsel be appointed as Class Counsel.

## **MEMORANDUM OF LAW**

## I.    **PRELIMINARY STATEMENT**

This case centers on the misrepresentations made by Defendants during the IPO, SPO and throughout the Class Period, concerning TOMO's most important benchmark of revenue growth – its backlog. The Corrected Second Amended Consolidated Class Action Complaint (the "SAC")[3] alleges that through the IPO and SPO, Defendants disseminated to the investing public IPO and SPO Documents that contained materially misleading statements and/or omissions of material fact. Specifically, Plaintiffs allege that the IPO and SPO Documents misled the investing public because they contained false and misleading financial statements concerning the firm nature of the Company's backlog. In reality, the Company's backlog was not firm because it contained contingent orders such as those placed by the Sagemark Companies ("Sagemark"), which were subject to its ability to obtain financing.

Additionally, the SAC alleges that during the Class Period, Defendants knowingly or recklessly made material misrepresentations and/or failed to disclose material facts concerning the Company's ability to convert the majority of its backlog to revenue within the twelve-month

---

("Leno"), and Frances S. Taylor ("Taylor") (collectively, "Defendants"), any entity in which Defendants or any excluded person has or had a controlling interest, the officers and directors of TOMO, and the legal affiliates, representatives, heirs, controlling persons, successors, and predecessors in interest or assigns of any such excluded party.

[3]    "¶__" references herein refer to the SAC.

timeframe that Defendants had promised to the investing public. In reality, the Company's conversion of its revenue to backlog was delayed, and TOMO had not and could not convert the majority of its backlog to revenue within 12 months. When the truth about the Company's backlog came to light, the share price of TOMO stock dropped precipitously, resulting in millions of dollars in investor losses.

This federal securities class action should be certified under Rule 23(a) and (b)(3) because it satisfies all the pertinent requisites of Rule 23 and is eminently suitable for class treatment. As detailed below, Courts in this District have routinely certified securities class actions. This case should be no exception.[4]

## II.    STATEMENT OF FACTS

### A.    Background

TOMO was founded in 1997. ¶63. The Company develops, manufactures, and sells an advanced radiation therapy system for the treatment of a wide range of cancers, known as the Hi-Art system. *Id.* The Hi-Art system was introduced commercially in 2003, and between 2003 and May of 2007, the Company established an install base of 125 Hi-Art systems worldwide. *Id.* Thereafter, it continued to invest heavily in research and technology, manufacturing and service infrastructure, as well as its sales force in order to sustain and continue its growth. *Id.*

The Hi-Art system is not an "off the shelf" product which can be ordered one day, and shipped the next. ¶4. Rather, the sales and delivery process for this product is lengthy. *Id.* To house the system, each customer would have to prepare a space known as a "bunker." *Id.* Once an

---

[4]    The certification sought by Plaintiffs, and the facts offered in support herein are commensurate to the claims that remain following the Court's Order issued on December 15, 2009. However, they do not represent an affirmation of the correctness of the Order nor a waiver of any of the facts or claims alleged in the SAC.

order is obtained, TOMO represented that investors could expect, based on historical experience, that revenue related to that order could be booked within 12 months. *Id.*

### B.    The Offerings

To obtain additional funding to support an increase in the size of its sales organization, Defendants conducted an IPO of TOMO stock. ¶30. On May 9, 2007, the Company offered 11,743,420 shares of TOMO stock to the public at a price of $19 per share. *Id.* In connection with the IPO, TOMO issued the IPO Documents. ¶¶30-31. The IPO Documents touted TOMO's backlog, which it defined as "the total contractual value of all ***firm*** orders received for the Hi-Art system and optional related products." *Id.* at ¶31.[5] Through the IPO, the Company realized almost $185.6 million in net proceeds. ¶30.

The IPO was followed by an SPO. ¶33. On October 11, 2007, the Company announced the pricing of its SPO of 8,500,000 shares with an over allotment of 1,275,000 shares of its common stock at a price of $22.25. *Id.* Like the IPO prospectus, the SPO Documents touted the Company's ***"firm"*** backlog, 12-month revenue cycle, and expected backlog deliverability. ¶34. The SPO was completed on October 16, 2007. ¶33. All of the shares sold during the SPO were by certain shareholders of TOMO. *Id.* Defendants Robertson and Hathaway realized approximately $6,492,573 in proceeds from the SPO. *Id.*

The statements made in the IPO and SPO Documents were false and misleading because, although Defendants stated that the Company's backlog was firm, it actually contained contingent orders such as the Sagemark orders. For example, as detailed through a series of communications between the Chief Executive Officer ("CEO") of Sagemark, and sales managers of TOMO, as well as TOMO's Director of US Sales, Northern Region, Sagemark had placed numerous orders for

---

[5]    All emphasis is added, and internal citations omitted, unless otherwise indicated.

TOMO's Hi-Art system that were contingent on Sagemark's ability to obtain financing. ¶¶72-77. Indeed, despite Sagemark's shaky financial condition, representatives of TOMO promised the CEO of Sagemark that should Sagemark be unable to obtain financing, it would have the right to terminate the purchase orders and receive its full deposit back. ¶¶82-94. Unbeknownst to the market, despite the obviously contingent nature of the Sagemark orders, TOMO entered these speculative orders worth $18 million into its supposedly "*firm*" backlog.

## C.    Misstatements During the Class Period

In addition to the false and misleading statements made by Defendants concerning the Company's firm backlog in the IPO and SPO Documents, Defendants also issued a series of false and misleading statements during the Class Period concerning the Company's conversion cycle. Indeed, throughout the Class Period, Defendants falsely touted, among other things, the expected conversion of a majority of its backlog into revenue within 12 months. *See, e.g.*, ¶¶121-122, 124,131-132, 140, 143, 148, 152, 159-161, and 163. These statements were false and misleading because Defendants had not historically converted backlog to revenue within 12 months, and at the time these statements were made, many of the orders in the Company's backlog were projected to take more than 12 months to convert to revenue. *See, e.g.*, ¶¶128, 136-137, 142, 145-146, 149-150, 156-157, and 164-165. Moreover, these statements were false and misleading because Defendants aggressively pursued orders at the end of fiscal quarters and the fiscal year by providing contingencies to customers so that they could pull revenues from these orders into backlog, and give the appearance that the backlog was stronger than it was. *See, e.g.*, ¶¶137, 146, 165. In such a way, TOMO's backlog was artificially inflated during the Class Period. In addition, through their misleading statements, Defendants succeeded in artificially inflating TOMO's stock price, which enabled the Company to complete two offerings, and allowed Defendants Hathaway and Robertson

- 5 -

to profit personally through the sale of their shares during the SPO at prices that were approximately 130% higher than the TOMO stock price following the revelation of the truth. ¶184.

### D.    The Truth Is Revealed

On April 17, 2008, the truth regarding the composition of TOMO's backlog was finally revealed to the market. ¶¶166-173. Defendants issued a press release announcing a loss, and stating that they were revising their annual guidance for 2008 as a result of a shift in delivery of systems to customers. ¶166. Defendant Robertson acknowledged for the first time that a significant and growing portion of TOMO's customers were for-profit accounts that placed multi-unit orders that remain in backlog materially longer than single system orders. *Id.* Defendants admitted that a "key contributing factor" to its revenue miss was that multi-unit orders placed during 2007 would not be delivered until 12 plus months from their order date – as late as 2009. *Id.*

In the earnings conference call that followed, Defendant Robertson explained that this was a product of the Company's new strategy of targeting for-profit accounts, which materially altered the Company's overall revenue cycle. ¶¶168-170. Indeed, at the end of the Class Period, Defendants admitted that they had embarked on this change in strategy at the end of 2006, and that they had little experience in managing the backlog associated with the for-profit accounts. ¶¶168-170, 173.

The market was stunned by these revelations, which stood in stark contrast to Defendants' Class Period statements. As a result, the price of TOMO stock plunged by approximately 32% to close at $9.10 per share on April 18, 2008, causing millions in shareholder losses. ¶167. Indeed, the drop in TOMO's stock price represented a loss of $213 million in market value in one day. *Id.* During the Class Period, analysts had depended on the reliability of TOMO's backlog figures in evaluating TOMO's performance. *See* ¶¶66-67, 101. In response to these revelations, however, analysts raised questions regarding the Company's backlog – its most significant metric. ¶¶10, 174, 177.

As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and other members of the Classes suffered damages.

## III.    PROCEDURAL HISTORY

On October 23, 2008, Plaintiffs filed the Consolidated Amended Class Action Complaint (the "Complaint").  The Complaint alleged that Defendants violated Sections 10(b), 20(a), and 20A of the Exchange Act, and Sections 11 and 15 of the Securities Act.  In particular, the Complaint alleged that Defendants violated the securities laws by making false and misleading statements in TOMO's IPO and SPO Documents, and other public statements throughout the Class Period (May 9, 2007 through April 17, 2008), concerning its revenue backlog, which it represented was the key indicator of the Company's financial performance.  ¶66.

On December 8, 2008, Defendants moved to dismiss the Complaint ("Original Motion"). After the Original Motion was fully briefed, on July 8, 2009, the Court issued an Order (the "July 8th Order"), which sustained Plaintiffs' Section 11 claims with respect to allegations that TOMO's backlog contained only "firm" or non-contingent orders.  July 8th Order at 2.  Specifically, the Court found that Plaintiffs' allegations that the Sagemark orders were subject to financing and were cancelable with a full return of Sagemark's deposit supported an inference that the Company's backlog contained orders that were contingent and not "firm."  July 8th Order at 26-29. Accordingly, the Court held that Defendants' statements in the IPO and SPO Documents that TOMO's backlog only contained "firm" orders were misleading.  *Id.* at 29.

While the Court dismissed Plaintiffs' 20A claim and their Section 10(b) claims and Section 11 claim with respect to statements that a "majority" or "significant majority" of the Company's backlog would be converted to revenue within 9 to 12 months, the Court did so without prejudice, and allowed Plaintiffs an opportunity to file a second amended complaint.  *Id.* at 43.

Pursuant to the Court's Order, Plaintiffs filed the SAC on August 3, 2009, which cured the deficiencies of the Complaint and addressed the concerns of the Court. [Dkt. No. 40].[6] On September 3, 2009, Defendants moved to dismiss the SAC. [Dkt. Nos. 54-55]. Plaintiffs filed a memorandum in opposition to Defendants' motion to dismiss the SAC on October 12, 2009. [Dkt. No. 62]. Thereafter, Defendants filed a reply in support of their motion to dismiss. [Dkt. No. 66].

On December 15, 2009 the Court issued an Order denying in part and granting in part Defendants' second motion to dismiss (the "December Order"). [Dkt. No. 69]. In the December Order, the Court again sustained Plaintiffs' Section 11 and 15 claims with respect to statements concerning the Company's supposedly "firm" backlog. December Order at 7-10. The Court also sustained Plaintiffs' Sections 10(b) and 20(a) claims as to Defendants' false and misleading statements made outside the IPO and SPO Documents concerning TOMO's ability to convert backlog to revenue within 12 months. December Order at 12-13.

In so doing, the Court held that Defendant Hathaway's definition of majority as "95% or more" was intentionally provided in response to a comparison of competitors' backlogs converting at a rate of 60-65%. December Order at 12. Moreover, the Court held that Defendants did not attempt to retract this definition until at least after the end of the Class Period. *Id.* The Court further held that in failing to correct this definition, Defendants did not dispel the impression that 95% of TOMO's backlog would convert to revenue within 12 months. *Id.* at 12-13. As 95% of the Company's backlog had not converted to revenue within 12 months, the Court found Defendants' statements concerning the conversion of backlog to revenue to be misleading. *Id.* The Court also held that Plaintiffs had alleged a strong inference of Defendants' scienter with respect to these statements. *Id.* at 16. Moreover, the Court determined that Plaintiffs had adequately pled a "fraud-on-the-market"

---

[6]    The SAC was later amended by interlineation on August 28, 2009 [Dkt. No. 48].

loss with respect to Defendants' statements concerning the conversion time for a majority of the Company's backlog.  *Id.* at 18-19.

## IV.    ARGUMENT

### A.    Courts Favor Class Treatment of Securities Fraud Class Actions

"[The Seventh Circuit's] policy is to favor maintenance of class actions.  This policy operates just as surely in cases where securities fraud is charged."  *King v. Kansas City S. Indus., Inc.*, 519 F.2d 20, 26 (7th Cir. 1975).  Courts in the Seventh Circuit have found class certification to be particularly appropriate in securities cases.  *Levitan v. McCoy*, No. 00-5096, 2003 WL 1720047, at *6 (N.D. Ill. Mar. 31, 2003) ("securities fraud cases are uniquely situated to class action treatment"); *Tatz v. Nanophase Techs. Corp.*, No. 01-8440, 2003 WL 21372471, at *3 (N.D. Ill. June 13, 2003) (same); *In re Bank One Sec. Litig./First Chicago S'holder Claims*, No. 00-0767, 2002 U.S. Dist. LEXIS 8709, at *7 (N.D. Ill. May 9, 2002) (same); *In re Sys. Software Assocs., Inc. Sec. Litig.*, No. 97-177, 2000 WL 1810085, at *4 (N.D. Ill. Dec. 8, 2000) (same).[7]

---

[7]    Likewise, courts throughout the country have continuously recognized the necessity for class actions to enforce the federal securities laws.  *See, e.g.*, *Basic Inc. v. Levinson*, 485 U.S. 224 (1988); *In re MIVA, Inc. Sec. Litig.*, No. 05-201, 2008 U.S. Dist. LEXIS 21108, at *29 (M.D. Fla. Mar. 12, 2008); *In re Scientific-Atlanta, Inc. Sec. Litig.*, 571 F. Supp. 2d 1315, 1343 (N.D. Ga. 2007) ("As a general rule, class action treatment presents a superior method for the fair and efficient resolution of securities fraud cases."); *In re Direct Gen. Corp. Sec. Litig.*, No. 05-0077, 2006 U.S. Dist. LEXIS 56128, at *21 (M.D. Tenn. Aug. 8, 2006) ("Plaintiffs contend that class actions are particularly appropriate means for resolving securities fraud litigation.  This Court agrees."); *In re Accredo Health, Inc. Sec. Litig.*, No. 03-2216, 2006 U.S. Dist. LEXIS 97621, at *37 (W.D. Tenn. Mar. 7, 2006) ("It is well-recognized that class actions are a particularly appropriate means for resolving securities fraud actions."); *In re Retek, Sec. Litig.*, 236 F.R.D. 431, 437 (D. Minn. 2006) ("Given the prohibitive costs required for the prosecution of this sophisticated securities fraud case, very few cases could prosecute it on an individual basis."); *In re Loewen Group Sec. Litig.*, 233 F.R.D. 154, 167 (E.D. Pa. 2005) ("Class actions are particularly appropriate in securities cases."); *Swack v. Credit Suisse First Boston*, 230 F.R.D. 250, 257-58 (D. Mass. 2005) ("[c]ourts have expressed a general preference for class certification in securities fraud cases bases on a policy favoring enforcement of the federal securities laws and recognition of the fact that class actions may be the only practical means of enforcing investors' rights").

Indeed, courts in this circuit recognize that "securities fraud cases are uniquely situated to class action treatment since the claims of individual investors are often too small to merit separate lawsuits. The class action is thus a useful device in which to litigate similar claims as well as an efficient deterrent against corporate wrongdoing." *Tatz*, 2003 WL 21372471, at *3 (citing *Gilbert v. First Alert, Inc.*, 904 F. Supp. 714, 719 (N.D. Ill. 1995)); *Bank One*, 2002 U.S. Dist. LEXIS 8709, at *7 (same); *Levitan*, 2003 WL 1720047, at *6 (same). "A class action is often the most fair and practicable means to address claims in securities cases" because "'those who have been injured are in a poor position to seek legal redress' . . . because individual claims might be small in monetary value, they might not be prosecuted on an individual basis due to the costs of litigation." *Bank One*, 2002 U.S. Dist. LEXIS 8709, at *7-*8; *Levitan*, 2003 WL 1720047, at *6 (same). Accordingly, there is strong public policy favoring class actions in securities suits. *Grossman v. Waste Mgmt., Inc.*, 100 F.R.D. 781, 784 (N.D. Ill. 1984); *In re Gen. Instrument Corp. Sec. Litig.*, No. 96 C 1129, 1999 WL 1072507, at *4 (N.D. Ill. Nov. 18, 1999).[8]

In recognition of the class action's significant role in protecting investors, courts within the Seventh Circuit liberally construe the requirements of Rule 23 in favor of class certification. *Bank One*, 2002 U.S. Dist. LEXIS 8709, at *7-*8; *Pope v. Harvard Bancshares, Inc.*, 240 F.R.D. 383, 387 (N.D. Ill. 2006); *Tatz*, 2003 WL 21372471, at *3. As the U.S. Supreme Court has held, class

---

[8]    Courts in the Seventh Circuit routinely certify securities class actions pursuant to Rule 23. *See, e.g.*, *Makor Issues & Rights, Ltd. v. Tellabs, Inc.*, 256 F.R.D. 586 (N.D. Ill. 2009) ("*Makor*"); *Schleicher v. Wendt*, No. 02-1332, 2009 U.S. Dist. LEXIS 24810 (S.D. Ind. Mar. 20, 2009); *Silverman v. Motorola, Inc.*, 259 F.R.D. 163 (N.D. Ill. 2009); *Roth v. Aon Corp.*, 238 F.R.D. 603, 605 (N.D. Ill. 2006); *In re Neopharm, Inc. Sec. Litig.*, 225 F.R.D. 563 (N.D. Ill. 2004); *Tatz*, 2003 WL 21372471; *Bank One*, 2002 U.S. Dist. LEXIS 8709, at *7; *In re Anicom Inc. Sec. Litig.*, No. 00-4391, 2002 U.S. Dist. LEXIS 5575 (N.D. Ill. Mar. 26, 2002); *Sutton v. Bernard*, No. 00-6676, 2001 U.S. Dist. LEXIS 21300 (N.D. Ill. Dec. 17, 2001); *Software Assocs.*, 2000 U.S. Dist. LEXIS 18285; *Weiner v. Quaker Oats Co.*, No. 98-3123, 1999 U.S. Dist. LEXIS 17222 (N.D. Ill. Sept. 28, 1999); *Retsky Family Ltd. P'ship v. Price Waterhouse LLP*, No. 97-7694, 1999 U.S. Dist. LEXIS 11351 (N.D. Ill. July 21, 1999); *Miller v. Material Scis. Corp.*, No. 97-2450, 1999 U.S. Dist. LEXIS 10628 (N.D. Ill. June 25, 1999).

certification does not require a determination on the merits of the allegations asserted:

> [The court has no] authority to conduct a preliminary inquiry into the merits of a suit in order to determine whether it may be maintained as a class action.
>
>                        \*         \*         \*
>
> In determining the propriety of a class action, the question is not whether plaintiff or plaintiffs have stated a cause of action or will prevail on the merits, but rather whether the requirements of Rule 23 are met.

*Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 177-178 (1974).

Moreover, while the Seventh Circuit has determined that on a motion for class certification, a court need not accept all of the complaint's allegations as true and may conduct factual and legal inquiries as necessary under Rule 23, there are limitations. *Szabo v. Bridgeport Machs., Inc.*, 249 F.3d 672, 675 (7th Cir. 2001). *See also Makor*, 256 F.R.D. at 595 (holding that "*Szabo* is limited to factual and legal inquiries necessary to determining whether Rule 23's requirements are met – neither Szabo nor more recent precedent permits the Court to decisively consider the merits and thus remove from the parties the benefit of summary judgment or trial.") (citing *Szabo*, 249 F.3d at 675). Indeed, any such inquiry conducted by the court is limited to whether the requirements of Rule 23 have been satisfied. *Makor*, 256 F.R.D. at 594; *Motorola*, 259 F.R.D. at 168 (same). "[A] court may not refuse to certify a class on the ground that it thinks the class will eventually lose on the merits." *Makor*, 256 F.R.D. at 594 (quoting *Loeb Indus., Inc. v. Sumitomo Corp.*, 306 F.3d 469, 480 (7th Cir. 2002)); *Motorola*, 259 F.R.D. at 168 (same). *See also Schleicher*, 2009 U.S. Dist. LEXIS 24810, at \*5 ("Class certification depends not on which side will prevail but on whether the requirements of Federal Rule of Civil Procedure 23 are met."). Consequently, the sole issue presented in this motion for class certification is whether Plaintiffs have fulfilled the requirements of Rule 23.

For a class to be certified pursuant to Rule 23, the four requirements of Rule 23(a) must be satisfied, as well as at least one of the conditions under Rule 23(b). As demonstrated below,

Plaintiffs have satisfied the prerequisites of Rule 23(a) and the requirements of Rule 23(b)(3) for the proposed Classes.  Therefore, class certification is proper.

### B.   This Action Satisfies the Standards for Class Certification Under Fed. R. Civ. P. 23(a)

Rule 23(a) of the Federal Rules of Civil Procedure establishes four prerequisites to class certification: (1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class.  *Ruppert v. Alliant Energy Cash Balance Pension Plan*, 255 F.R.D. 628, 633-34 (W.D. Wis. 2009) (certifying class action).  Plaintiffs satisfy each of these prerequisites.

### 1.   The Classes are So Numerous that Joinder of All Members is Impracticable

To be certified, the class must be "so numerous that joinder of all members is impractical." *Tatz*, 2003 WL 21372471, at *5 (quoting Fed. R. Civ. P. 23(a)(1)).  With respect to numerosity, "there is no mystical number at which the [] requirement is established, courts have found this element satisfied when the putative class consists of as few as 10 to 40 members."  *Id.*; *see also Levitan*, 2003 WL 1720047, at *3 ("there is no magic number needed to establish numerosity"). Courts should apply common sense to the facts available.  *See id.*; *Gen. Instrument Corp.*, 1999 WL 1072507, at *2.

"[I]n securities fraud suits involving nationally traded securities, numerosity may be assumed."  *Software Assocs.*, 2000 WL 1810085, at *1.  Indeed, where a class has been defined to join "hundreds and perhaps thousands of investors," there may be no question as to numerosity. *Motorola*, 259 F.R.D. at 169.  *See also Neopharm*, 225 F.R.D. at 565 (certifying class and finding the numerosity requirement satisfied where although the precise number of shareholders was unknown, the company had more than 16 million shares outstanding and being traded on NASDAQ,

- 12 -

because it could be "reasonably inferred that hundreds, if not thousands, of persons would be included in the proposed class"); *Tatz*, 2003 WL 21372471, at *6 (numerosity as required by 23(a)(1) was established where 13 million shares of company's common stock were publicly traded on NASDAQ national market and "were likely owned by hundreds of persons or entities throughout the United States"). Moreover, in a securities class action, a plaintiff "need not demonstrate the exact number of class members so long as a conclusion is apparent from good faith estimates." *Software Assocs.*, 2000 WL 1810085, at *1.

The proposed 10b-5 Class easily satisfies the numerosity requirement. During the Class Period, TOMO's common stock was listed and actively traded on the NASDAQ National Market ("NASDAQ"), an open and efficient market. According to the Company's Form 10-K filed on March 19, 2008, TOMO had approximately 50,083,964 shares of common stock outstanding on February 29, 2008.[9] Further, when the Class Period ended on April 17, 2008, the price of TOMO stock dropped approximately 32% on extraordinary volume in excess of eight million shares. ¶11. Accordingly, although the exact number of Class members is unknown at this time, it stands that there are at least hundreds, if not thousands, of individuals and entities located throughout the United States who purchased or otherwise acquired TOMO's common stock at artificially inflated prices during the Class Period.

---

[9]     A true and accurate copy of the relevant portions of TOMO's Form 10-K filed on March 19, 2008 is attached hereto as **Exhibit A**. The Court can take judicial notice of the number of outstanding shares reported by TOMO in its SEC filings. *See, e.g.*, *In re Career Educ. Corp.*, No. 03-8884, 2007 WL 1029092, at *1 n.5 (N.D. Ill. Mar. 29, 2007) (noting that a court can take judicial notice of SEC filings); *Gavin v. AT&T Corp.*, No. 01-2721, 2004 WL 2260632, at *1 (N.D. Ill. Sept. 30, 2004) ("the court may consider evidence of which it can take judicial notice, and that includes SEC filings"); *In re Guidant Corp. Sec. Litig.*, 536 F. Supp. 2d 913, 921 (S.D. Ind. 2008), *aff'd*, 583 F.3d 995 (7th Cir. 2009) ("Among the documents of which a court may take judicial notice are public records, including SEC filings.").

Similarly, the IPO and SPO Classes also satisfy the numerosity requirement.  In the IPO, TOMO offered 11,743,420 shares of its common stock.  ¶30.  *See* Prospectus filed on Form 424B4 on May 9, 2007, a true and accurate copy of which is attached hereto as **Exhibit B.**  Additionally, in the SPO, TOMO offered 8,500,000 shares of common stock with an over-allotment of 1,275,000. ¶33.  After the SPO, 49,414,153 shares were immediately outstanding.  *See* Prospectus filed on Form 424B4 on October 11, 2007, a true and accurate copy of which is attached hereto as **Exhibit C**. Thus, the IPO and SPO Classes are likely comprised of thousands of persons and/or entities, making joinder highly problematic and inefficient.

Courts routinely certify classes in actions where the size of the proposed class is far smaller than those proposed here.  The Seventh Circuit has indicated that a class as small as 40 members would be sufficient for class treatment under Rule 23(a).  *See Swanson v. Am. Consumer Indus. Inc.*, 415 F.2d 1326, 1333 n.9 (7th Cir. 1969) (a class limited to 40 stockholders would satisfy the numerosity requirement "where the individual members of the class are widely scattered and their holdings are generally too small to warrant undertaking individual actions").  Likewise, district courts within the Seventh Circuit have determined that classes significantly smaller than the putative Classes involved here may be certified.  *See Markham v. White*, 171 F.R.D. 217, 221 (N.D. Ill. 1997) (35-40 class members); *Riordan v. Smith Barney*, 113 F.R.D. 60, 62 (N.D. Ill. 1986) (29 class members).  As it would be "extremely difficult" to join the hundreds – or thousands – of geographically diverse TOMO shareholders, joinder is impracticable here, and the numerosity requirement is satisfied.  *See Tatz*, 2003 WL 21372471, at *6.

### 2. There are Questions of Law and Fact Common to Each Member of the Proposed Classes

The second requirement of Rule 23(a) is that class members share common questions of law or fact.  Rule 23(a), however, does not require complete identity of a named plaintiff's claims with those of the Class.  *See In re Hartmarx Sec. Litig.*, No. 01-7832, 2002 WL 31103491, at *4 (N.D. Ill.

Sept. 19, 2002) ("The fact that there are factual variations among class members['] claims does not in itself defeat the certification of a class."); *Abrams v. Van Kampen Funds, Inc.*, No. 01-7538, 2002 WL 1989401, at *3 (N.D. Ill. Aug. 27, 2002) ("Rule 23(a)(2) commonality is not a demanding requirement; one issue of fact or law common to all class members will suffice."); *Tylka v. Gerber Prods. Co.*, 178 F.R.D. 493, 496 (N.D. Ill. 1998) (noting that commonality may be satisfied if at least one question of law or fact is common to the class); *Aon*, 238 F.R.D. at 606 (as is the case with respect to numerosity, the commonality requirement "has been characterized as a low hurdle, easily surmounted."); *Tatz*, 2003 WL 21372471, at *6.

The commonality requirement "is usually satisfied when a common nucleus of operative facts unites a class." *Rosario v. Livaditis*, 963 F.2d 1013, 1018 (7th Cir. 1992). *See also Neopharm*, 225 F.R.D. at 565 (Courts have held that "[a] common nucleus of operative fact is usually enough to satisfy the commonality requirement of Rule 23(a)(2)."); *Hartmarx*, 2002 WL 31103491, at *4 (same). A common nucleus of operative fact exists where "defendants have engaged in standardized conduct towards members of the proposed class." *Id*. Simply put, "[t]his element is satisfied when each class member's claim hinges on the same conduct by the defendants." *Tatz*, 2003 WL 21372471, at *6. In the context of a securities suit, the Defendants' conduct in disseminating materially false and misleading statements to the investing public will easily satisfy a "common nucleus" of standardized conduct. *Hartmarx*, 2002 WL 31103491, at *5. Furthermore, securities actions involve several common questions of law and fact related to the Defendants' conduct *See, e.g.*, *Tatz*, 2003 WL 21372471, at *6 (certifying a class where common questions included whether the federal securities laws were violated by the defendants' acts and omissions; whether the defendants participated in and pursued the common course of conduct; whether the defendants acted willfully, knowingly, or recklessly; and whether the market price of the defendant company's stock was artificially inflated due to the alleged conduct by the defendants); *Van Kampen Funds*, 2002 WL

1989401, at *3 (finding requirement met where common questions included whether defendants violated federal securities laws; whether prospectuses and registration statements were materially false and misleading; and whether defendants were negligent and/or grossly negligent in omitting or misrepresenting any material facts); *Neopharm*, 225 F.R.D. at 566 (commonality element satisfied where common questions of law and fact included whether the defendants omitted and/or misrepresented material facts; whether defendants knew or recklessly disregarded that their statements were false and misleading; whether the price of the company's publicly traded securities was artificially inflated; and the extent of damage sustained by members of the putative class and the appropriate measure of damages).

Courts have held that where the same scheme operates on a class of purchasers for an extended period of time, the requirement of (a)(2) will likely be satisfied. *See, e.g.*, *Hochschuler v. G.D. Searle & Co.*, 82 F.R.D. 339, 344 (N.D. Ill. 1978) ("Where the same scheme operates on a class of open market purchasers over an extended length of time, the requisite of subsection (a)(2) has been met."); *Harman v. LyphoMed, Inc.*, 122 F.R.D. 522, 526 (N.D. Ill. 1988) (finding commonality satisfied where plaintiffs alleged a "continual, unchanging scheme" by defendants to materially misrepresent LyphoMed's financial condition; at least three critical questions were common to all claims under this scheme: did defendants materially misrepresent the company's financial condition, did they act with the necessary scienter, and did the market price for LyphoMed stock reflect these misrepresentations).

Here, the 10b-5 Class claims arise out of the same alleged course of conduct – Defendants' omissions and issuance of materially false and misleading statements during the Class Period concerning TOMO's ability to convert backlog to revenue within the twelve-month time period. Indeed, the SAC alleges numerous common questions of law and fact shared by the 10b-5 Class members, such as:

1. Whether the federal securities laws were violated by Defendants' alleged acts and omissions;

2. Whether the statements made by Defendants to the investing public during the Class Period misrepresented and/or omitted material facts about the business and operations of TOMO;

3. Whether the Defendants acted willfully, with knowledge, or were reckless, in omitting and/or misrepresenting material facts;

4. Whether the prices of TOMO's publicly traded securities were artificially inflated during the Class Period; and

5. Whether the members of the Class have sustained damages and, if so, what is the appropriate measure of damages.

*See* ¶207.

Proving the existence and nature of Defendants' material omissions and materially false and misleading statements during the Class Period – the most important issue in a securities case – will be common to all members of the 10b-5 Class in this action. That is, Defendants' alleged false statements and omissions were uniformly made to members of the Classes – via press releases, conference calls and through filings with the SEC, as set forth in the SAC.

Likewise, the IPO and SPO Class claims arise out of the same alleged course of conduct – Defendants' omissions and issuance of materially false and misleading statements concerning TOMO's supposedly firm backlog in the IPO and SPO Documents. The proposed IPO and SPO Classes meet the commonality standard because the SAC alleges common questions of law and fact shared by the IPO and SPO Class members, such as:

1. Whether Sections 11 and 15 of the Securities Act were violated by Defendants' alleged acts and omissions;

2. Whether the Company's Registration Statements and Prospectuses issued by Defendants to the investing public in connection with the IPO and SPO contained untrue or misleading statements of material fact or omitted to state facts necessary to make the statements made therein not misleading, and were not prepared in accordance with the rules and regulations governing its preparation; and

> 3. Whether the members of the Classes have sustained damages, and, if so, what is the appropriate measure of damages.

*See* ¶¶203, 207.

Proving the existence and nature of Defendants' material omissions and materially false and misleading statements in the IPO and SPO Documents will be common to all members of the IPO and SPO Classes in this action. Indeed, Defendants' alleged false statements and omissions in the respective IPO and SPO Documents were uniformly made to members of the respective Classes, as set forth in the SAC. ¶¶30-35.

Further, the same facts that give rise to Plaintiffs' claims also give rise to the claims of the members of the proposed Classes. Absent Class members necessarily would have to prove the identical facts and answer identical legal questions if they pursued their claims individually. *See Odmark v. Mesa Ltd. P'ship*, 91-2376, 1992 U.S. Dist. LEXIS 16789, at *10 (N.D. Tex. June 5, 1992), *aff'd*, 59 F.3d 1241 (5th Cir. 1995) ("If the class plaintiffs prove their case with respect to the alleged wrongful conduct, they will also have provided all the proof needed on the issue of misrepresentation for every other member of the class."). Accordingly, Plaintiffs have demonstrated the existence and predominance of common questions of fact and law.

### 3.     Plaintiffs' Claims Are Typical of Those of the Classes

The typicality requirement of Rule 23(a) is satisfied where, as here, the same event or course of conduct gives rise to the plaintiff's claims and the claims of other members, especially where the claims are based on the same legal theory. However, "typicality does not mean identical, and the typicality requirement is liberally construed." *See Neopharm*, 225 F.R.D. at 566*; Tatz*, 2003 WL 21372471, at *6 ("Rule [23] does not require that each member of a class suffer exactly the same injury as the named class representative"); *Van Kampen Funds*, 2002 WL 1989401, at *4 ("It is only necessary for the claim of the class representative and the claims of the class at large to have the 'same essential characteristics;' there may still be differences."). Indeed, where there is a similar

legal theory, the typicality requirement will be satisfied "[e]ven when factual differences exist." *Tatz*, 2003 WL 21372471, at *6. *See also Wagner v. Nutrasweet Co.*, 95 F.3d 527, 534 (7th Cir. 1996) (typicality "should be determined with reference to the [defendants'] actions, not with respect to particularized defenses it might have against certain class members").

Here, Plaintiffs' claims are identical to those of the Classes. Plaintiffs' claims arise out of the same course of conduct as the Classes' claims and are premised on the same legal theories. For example, Plaintiffs and other members of the proposed 10b-5 Class allege that Defendants' dissemination of materially false and misleading public information, which artificially inflated the price of TOMO's common stock throughout the Class Period, caused harm once revealed. Moreover, Plaintiffs' claims, like the 10b-5 Class claims, are premised on the same legal theory – Defendants' violations of Exchange Act and Rule 10b-5 promulgated thereunder. Finally, Plaintiffs and the proposed 10b-5 Class relied on the integrity of the market when they purchased TOMO common stock at prices that were artificially inflated by Defendants' misrepresentations and omissions, and were damaged upon the revelation of the true operating condition of the Company and the true nature of its backlog.

Likewise, Plaintiff Spanberger's claims are typical of the claims of the other members of the proposed IPO Class. Plaintiff Spanberger was injured when he purchased TOMO's common stock pursuant or traceable to the IPO with respect to which Defendants issued materially false and misleading IPO Documents.[10] In support of these claims, Spanberger, like all IPO Class members,

---

[10]    Plaintiff Spanberger purchased TOMO common stock on October 8, 2007, October 9, 2007, and October 10, 2007, prior to the SPO. *See* Composite Exhibit D. As the only TOMO shares in the market at this time were IPO shares, Plaintiff Spanberger can trace his shares to the IPO. *See Krim v. PCOrder.com, Inc.*, 402 F.3d 489, 492 (5th Cir. 2005) (holding that where the pool of stock only contained IPO stock, the lead plaintiff's stock was necessarily IPO stock and the lead plaintiff was able to satisfy the traceability requirement of Section 11 and establish standing); *DeMaria v. Andersen*, 318 F.3d 170, 176 (2d Cir. 2003) ("In a case such as this one, where there has been only

will seek to prove the existence of the misrepresentations and/or omissions in the IPO Documents.

Similarly, Plaintiff Van Roosmalen's claims are typical of the claims of the other members of the proposed SPO Class.[11]   Plaintiff Van Roosmalen was injured when he purchased TOMO's common stock pursuant or traceable to the SPO with respect to which Defendants issued materially false and misleading SPO Documents.  In support of these claims, Van Roosmalen, like all SPO Class members, will seek to prove the existence of the misrepresentations and/or omissions in the SPO Documents.

Thus, because their claims arise from the same "course of action that gives rise to the claims of other class members and . . . are based on the same legal theory,"  Plaintiffs' claims satisfy the typicality requirement of Rule 23(a)(3).  *See Software Assocs.*, 2000 WL 1810085, at *2 (granting class certification).

### 4.    Plaintiffs Will Fairly and Adequately Represent the Classes

Rule 23(a)(4) requires that "the representative parties will fairly and adequately protect the interests of the class."  Fed. R. Civ. P. 23(a)(4).  This requirement is met where it appears that: (1) the claims of the class representatives and other members of the class are not antagonistic; (2) the class representatives are sufficiently interested in the outcome of the case; and (3) experienced, competent counsel represents them.  *See Motorola*, 259 F.R.D. at 173; *Tatz*, 2003 WL 21372471, at *8; *Van Kampen Funds*, 2002 WL 1989401, at *5; *Rosario*, 963 F.2d at 1018.

---

one stock offering, any person who acquires the security may sue under §11, 'regardless of whether he bought in the initial offering, a week later, or a month after that.'"); *In re Initial Public Offering Sec. Litig.*, 243 F.R.D. 79, 92 (S.D.N.Y. 2007) ("Moreover, because Rediff had only one IPO, there is no issue as to whether class members must individually trace their shares to the particular IPO that allegedly had a deficient registration statement.").

[11]    Plaintiff Van Roosmalen purchased TOMO common stock on October 16, 2007, the day of the SPO, at a price of $23.62, which is nearly identical to the SPO Offering price of $22.25.  *See* Composite Exhibit D.  Thus, as Plaintiff Van Roosmalen bought his stock pursuant to the SPO, he has standing to represent the SPO Class.

Here, for each of the proposed Classes, Plaintiffs satisfy all three prongs of the adequacy test of Rule 23(a)(4). With respect to the first prong, Plaintiffs, like all 10b-5 Class members, were injured as a result of Defendants' false and misleading public statements throughout the Class Period that artificially inflated the Company's stock price until the truth of the false and misleading nature of the statements emerged. Thus, Plaintiffs' interests are not antagonistic to the interests of the prospective 10b-5 Class members, but, rather, are coextensive.

Additionally, Spanberger purchased TOMO common stock pursuant or traceable to the IPO. Spanberger, like all IPO Class members, was injured by Defendants' misrepresentations and omissions of material facts in the IPO Documents. Likewise, Van Roosmalen purchased TOMO common stock pursuant or traceable to the SPO. Van Roosmalen, like all SPO Class members, was injured by Defendants' misrepresentations and omissions of material facts in the SPO Documents. Accordingly, Spanberger's and Van Roosmalen's interests are not antagonistic to the interests of their respective IPO and SPO Class members, but rather, are coextensive. Proof of Plaintiffs' claims will establish the same issues of law and fact as the claims of the Classes as a whole. As a result, Plaintiffs and the Classes have precisely the same interest in achieving the maximum possible recovery.

Moreover, the proposed Class Representatives are sufficiently interested in the outcome of the case. In determining adequacy of a proposed class representative in complex actions such as securities actions, "a plaintiff need not have expert knowledge of all aspects of the case to qualify . . . a great deal of reliance on the expertise of counsel is to be expected." *Motorola*, 259 F.R.D. at 173. "An understanding of the basic facts underlying the claims, some general knowledge, and a willingness and ability to participate in discovery are sufficient to meet this standard." *Id.*; *see also Makor*, 256 F.R.D. at 601 (same). The proposed Class Representatives collectively purchased

15,500 shares of TOMO stock throughout the Class Period, sustaining substantial losses,[12] thus they have sufficient interest in the outcome of this litigation. Plaintiffs are willing and able to represent the Classes in this action. Plaintiffs understand the commitments and the fiduciary responsibilities attendant to serving as class representatives. Moreover, Plaintiffs have monitored this litigation from its inception. They will provide written responses to Defendants' discovery and will produce responsive documents in connection therewith. Moreover, they will sit for deposition if noticed. Finally, none of the proposed Class Representatives has any known conflict of interest that would prevent him from assuring the zealous prosecution of this action on behalf of the proposed Classes.

Additionally, Plaintiffs are represented by experienced and competent counsel. Proposed Class Counsel, Coughlin Stoia Geller Rudman & Robbins LLP ("Coughlin Stoia") and Law Offices of Bernard M. Gross, P.C. ("Gross Law"), will vigorously prosecute this action. Representation is adequate when counsel for the class is qualified and competent, and the interests of the representatives are not antagonistic to the interests of absent class members. *Gammon v. GC Servs. Ltd. P'ship*, 162 F.R.D. 313, 317 (N.D. Ill. 1995). These firms possess extensive experience litigating securities class actions and have successfully prosecuted numerous securities class actions on behalf of injured investors. There can be no legitimate dispute that Lead Counsel are qualified, experienced and capable of prosecuting this litigation on behalf of the Class. *See Makor*, 256 F.R.D. at 601 (reaffirming Court's previous appointment of lead counsel and liaison counsel for the class pursuant to the PSLRA); *Van Kampen Funds*, 2002 WL 1989401, at *5 (after finding lead plaintiffs to be adequate class representatives, stating "the attorneys for the lead plaintiffs are experienced and qualified securities fraud litigators. Rule 23(a)(4) is [thus] satisfied."); *Software Assocs.*, 2000 WL 1810085, at *3 (declaring "Plaintiffs' counsel are experienced in federal securities class action

---

[12]    Plaintiffs' certifications of their purchases of TOMO stock are attached hereto as **Composite Exhibit D**.

litigation" in finding representation to be adequate and certifying a class). Accordingly, Plaintiffs and their counsel are adequate for purposes of satisfying Rule 23(a)(4).

In addition to satisfying the adequacy prong of Rule 23(a)(4), Coughlin Stoia and Gross Law also satisfy the considerations of Rule 23(g) and should be appointed as Class Counsel. Rule 23(g)(4) requires the court to appoint counsel who will fairly and adequately represent the Class. Additionally, in appointing class counsel, Rule 23(g)(1)(A) requires the court to consider the following factors: "(i) the work counsel has done in identifying or investigating potential claims in the action; (ii) counsel's experience in handling class actions, other complex litigation, and the types of claims asserted in the action; (iii) counsel's knowledge of the applicable law; and (iv) the resources that counsel will commit in representing the class."

First, Coughlin Stoia and Gross Law have worked vigorously to prosecute this action since their appointment as Lead Counsel. If appointed as Class Counsel, Coughlin Stoia and Gross Law will continue to work to prove the claims being prosecuted by Plaintiffs on behalf of themselves and the Classes. Second, Coughlin Stoia and Gross Law have extensive experience in the prosecution and successful resolution of complex securities fraud class actions in courts in this District and throughout the United States.[13] For example, with respect to Coughlin Stoia, in *In re Enron Corp. Sec., Derivative & ERISA Litig.*, 586 F. Supp. 2d 732, 790, 797 (S.D. Tex. 2008), Judge Harmon stated:

> This Court considers Coughlin Stoia "a lion" at the securities bar on the national level. . . Lead Counsel's fearsome reputation and successful track record undoubtedly were substantial factors in Lead Counsel's obtaining these extraordinary recoveries.
>
> The experience, ability, and reputation of the attorneys of Coughlin Stoia is not disputed; it is one of the most successful law firms in securities class actions, if not the preeminent one, in the country.

---

[13]     *See* Firm biographies of Coughlin Stoia and Gross Law, which are attached hereto as **Exhibits E** and **F**, respectively.

Concerning *Enron*, Professor John Coffee of Columbia Law School stated:

> [E]ven if other counsel could have developed the same original legal theory (and this is uncertain), only a law firm with Lead Counsel's reputation for zealous advocacy could have convinced the defendants that this case would be carried to trial (at whatever cost it took) and represented too great a risk for them not to settle. In addition, Lead Counsel was litigating literally against the cream of the American corporate law bar…. To sum up, in my judgment, few other counsel (and perhaps no other) could have obtained this degree of success.

In *In re Qwest Commc'ns Int'l, Inc. Sec. Litig.*, 625 F. Supp. 2d 1143, 1150 (D. Colo. 2009) Judge Blackburn noted:

> Plaintiffs' lead counsel are highly skilled and specialized attorneys who use their substantial experience and expertise to prosecute complex securities class actions. Particularly in a case as complex as this case, lead counsel must have a very high level of experience and expertise if the plaintiffs are to have any chance of success. In this case, there is no serious challenge to the conclusion that lead counsel possesses a high level of skill and experience in securities class action suits. Further, lead counsel should be rewarded for their successful application of their skill and experience.

Most recently, in May 2009, Coughlin Stoia obtained a significant jury verdict in favor of a class of shareholders against the financial firm Household International Inc. and three of its former executives. *Jaffe v. Household Int'l, Inc.*, No. 02-05893 (N.D. Ill. May 7, 2009).

Likewise, judges throughout the country have recognized contributions of Gross Law in class action cases. In approving an $82.5 million settlement of a securities fraud lawsuit against Aetna, Inc. in the United States District Court for the Eastern District of Pennsylvania, in which Gross Law was co-lead counsel, Judge Padova stated:

> "Furthermore, class counsel is of high caliber with extensive experience in similar class action litigation . . . consistently submitted documents of superb quality, and were very diligent in preparing filings in a timely manner under tight deadlines . . . . This Court has made special note of the efficiency and professionalism of counsel in completing discovery and resolving discovery disputes with little court intervention."

*In re Aetna Inc. Sec. Litig.*, MDL No. 1219 (E.D. Pa. Jan. 5, 2001). Similarly, in approving a settlement of $106 million in the United States District Court for the Eastern District of

Pennsylvania, in *In re Auto. Refinishing Paint Antitrust Litig.*, MDL 1426, Judge Surrick commented

on Gross Law, noting:

> I want to commend counsel on both sides of this litigation. I think that the
> representation on both sides of this litigation is as good as I've ever seen in my entire
> professional career. Counsel worked together in this case. They frankly made the
> job of this Court very easy and I commend all of you for what you've done in this
> litigation.

Transcript of August 9, 2007 hearing at 18-19.

Also, in *Cortese v. Radian*, Civil Action No. 07-3375 (E.D. Pa. Jan. 30, 2008), Judge

McLaughlin stated: "Bernard Gross has been active in securities litigation for 30 years. The Court is

familiar with the firm and is confident that it is qualified to serve as liaison counsel."

As a result, Coughlin Stoia and Gross Law have vast knowledge of the applicable securities

laws at issue here. Moreover, since the Court's appointment of Lead Counsel on September 2, 2008,

Coughlin Stoia and Gross Law have demonstrated their willingness to commit substantial resources

to representing the Class in this action through its efforts in prosecuting this action to date. *See*

Section III, above. Because there is no question about the competence of counsel to fairly and

adequately represent the interests of the Classes, the requirements of Rule 23(a)(4) and Rule 23(g)

are satisfied and Plaintiffs' choice of counsel should be appointed as Class Counsel pursuant to Fed.

R. Civ. P. 23(g).

### C.    The Conditions of Rule 23(b)(3) Are Satisfied by the Proposed Classes

In addition to meeting the requirements of Rule 23(a), this action also satisfies the

requirements of Rule 23(b), that common questions of law or fact predominate over individual

questions, and that class action treatment is superior to other available methods of adjudication. As

set forth below, this case meets all the criteria set forth in Rule 23(b)(3).

Rule 23(b)(3) requires that common questions of law and fact predominate over questions

affecting individual members. "While common questions of law or fact must predominate, they

need not be exclusive.  To determine whether common questions predominate, courts look to whether there is a 'common nucleus of operative facts.'" *Tatz*, 2003 WL 21372471, at *9.  *See also Van Kampen Funds*, 2002 WL 1989401, at *4.  "The principal issues of law and fact relate to defendants' alleged misrepresentations. These issues are common to the members of the class and predominate over any questions affecting only individual members." *Software Assocs.*, 2000 WL 1810085, at *4.  Indeed, "[a] court should direct its inquiry primarily toward the issue of liability, rather than damages, in determining whether common questions predominate." *Van Kampen Funds*, 2002 WL 1989401, at *4.

### 1.    Common Questions of Law and Fact Predominate Over Individual Issues With Respect to Plaintiffs' Sections 11 and 15 Claims

Here, the SAC alleges that Defendants violated Sections 11 and 15 of the Securities Act. Section 11 of the Securities Act provides a private remedy for any purchaser of a security if "any part of the registration statement, when such part became effective, contained an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading."  15 U.S.C. §77k(a).  Section 11 imposes liability on the issuer of a security, as well as any person who signed the registration statement and/or served as a director of the issuer or performed similar functions if: (1) the registration statement as of its effective date contained an untrue statement of a material fact; (2) omitted to state a required material fact; or (3) omitted to state a material fact necessary to make the statements therein not misleading.  *In re First Merchs. Acceptance Corp. Sec. Litig.*, No. 97-2715, 1998 U.S. Dist. LEXIS 17760, at *34 (N.D. Ill. Nov. 2, 1998) ("Section 11 imposes civil liability on persons preparing and signing materially misleading registration statements.").  Moreover, a plaintiff need not prove reliance in order to establish a Section 11 violation.  *Friedman v. Rayovac Corp.*, 295 F. Supp. 2d 957, 979 (W.D. Wis. 2003).

Courts have long recognized that claims under Section 11 of the Securities Act are particularly well-suited for class treatment, insofar as plaintiffs allege misrepresentations and omissions in the same document(s), and issues of individual reliance will not predominate because reliance is not an element of a Section 11 claim. *See Herbst v. Able*, 47 F.R.D. 11, 18 (S.D.N.Y. 1969) ("to the extent plaintiffs' claims in these three actions arise only under Section 11 of the Securities Act of 1933, 15 U.S.C. §77k, individual reliance is not an issue and class actions are particularly appropriate."); *see also Weiss v. Tenney Corp.*, 47 F.R.D. 283, 289 (S.D.N.Y. 1969) (since each member of the class would have to establish proof that the Prospectus was materially false and misleading, there can be no doubt that the commonality requirement is met); *Bank One*, 2002 U.S. Dist. LEXIS 8709, at *12 ("Courts have repeatedly held that cases like this one, which proceed primarily under Section 11 of the 1933 Act, are particularly well-suited to class treatment . . . ."). The SAC successfully pleads these elements and, because every member of the IPO and SPO Classes has to establish these same facts, these common questions will predominate at trial.

2. **Common Questions of Law and Fact Predominate Over Individual Issues With Respect to Plaintiffs' Sections 10(b) and 20(a) Claims**

The SAC alleges that Defendants violated Sections 10(b) and 20(a) of the Exchange Act, and Rule 10b-5 promulgated thereunder. The elements comprising a Section 10(b) claim include: (1) a misstatement or an omission; (2) of material fact; (3) made with scienter; (4) that proximately caused the plaintiffs' injuries; and (5) on which the plaintiffs relied. *Makor Issues & Rights, Ltd. v. Tellabs, Inc.*, 437 F.3d 588, 595 (7th Cir. 2006), *overruled on other grounds by Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308 (2007). Because all members of the 10b-5 Class must establish the same facts to prove these elements and establish Defendants' liability, common questions of law and fact predominate in this case. *See Tatz*, 2003 WL 21372471, at *9 ("The defendants' alleged misstatements and omissions of material fact to members of the class are at the core of the

complaint.  The issues of law and fact that flow from the defendants' alleged misstatements and

omissions predominate over any individual issue."); *Neopharm*, 225 F.R.D. at 568 ("The court is

persuaded that questions common to the members of the class predominate over individual concerns.

As [plaintiff] points out, the main question involved in this case is whether defendants' alleged false

and misleading statements and material omissions violated [sections] 10(b) and 20(a) of the

[Securities Exchange] Act.").

Loss causation and damages, while not required to be proven at the class certification stage,

do not present individual questions of fact or law.  *Schleicher*, 2009 U.S. Dist. LEXIS 24810, at *34,

*38.[14]  As the court in *In re Worldcom, Inc. Securities Litigation* stated:

> The issue of loss causation is subject to class-wide proof.  The plaintiffs will have the
> burden of showing that the misrepresentations and omissions that they have
> identified caused the loss of which they complain.  If they carry this burden, loss
> causation will be established.

219 F.R.D. 267, 302 (S.D.N.Y. 2003).  The December Order on Defendants' motion to dismiss held

that the SAC adequately pleads loss causation with respect to Defendants' misleading conversion

cycle statements.  *See* December Order at 18, 19, 21 [Dkt. No. 69].  Thus, this element is also subject

to class-wide proof.  *See Basic*, 485 U.S. at 247.

Furthermore, individual issues regarding damages, such as how many shares of TOMO stock

each Class Representative bought, the respective purchase prices, and whether she/he sold those

shares, do not defeat class certification.  *See Beale v. Edgemark Fin. Corp.*, 164 F.R.D. 649, 658

(N.D. Ill. 1995) ("The only individual issues involve questions of damages . . . [which have] not

---

[14]    Indeed, *Schleicher*, one of the only courts in the Seventh Circuit to address the Fifth Circuit's
decision of  *Oscar Private Equity Invs. v. Allegiance Telecom, Inc.*, 487 F.3d 261 (5th Cir. 2007),
held that "this court does not find it persuasive in requiring proof of loss causation at the class
certification stage. Defendants cite no court outside the Fifth Circuit that has relied on this reasoning.
In fact, this aspect of *Oscar Private Equity* has been rejected by numerous courts. . . . *Oscar Private
Equity* runs contrary to Supreme Court and Seventh Circuit precedents that are controlling for this
court."  2009 U.S. Dist. LEXIS 24810, at *34-*35.

been held to bar a class action."); *Cent. Cmty. Church of God v. Ent & Imler CPA Group, PC*, No. 03 CV 0678, 2005 U.S. Dist. LEXIS 8679, at *15 (S.D. Ind. May 9, 2005) (individualized damages calculations should not undermine predominance); *Hubler Chevrolet, Inc. v. GMC*, 193 F.R.D. 574, 581 (S.D. Ind. 2000) (whereas "class actions commonly involve numerous levels of damages and injury for different class members … 'the extent of damages is not an issue' when certifying the class, . . . ") (citations omitted).

Although reliance is an element of a Section 10(b) claim, Plaintiffs alleged a "fraud-on-the-market theory," which raises a presumption of reliance supporting certification. *See Basic*, 485 U.S. at 247. "In general, the theory allows the court to presume that investors in a market variously described as 'impersonal,' 'open,' 'developed,' and 'efficient' relied on the integrity of the market price that reflected available public information, including statements the issuer and its agents had made to the market." *Schleicher*, 2009 U.S. Dist. LEXIS 24810, at *13.

The Supreme Court expressly endorsed the fraud-on-the-market doctrine in *Basic*, describing this theory as follows:

> The fraud on the market theory is based on the hypothesis that, in an open and developed securities market, the price of a company's stock is determined by the available material information regarding the company and its business . . . . Misleading statements will therefore defraud purchasers of stock even if the purchasers do not directly rely on the misstatements . . . . The causal connection between the defendants' fraud and the plaintiffs' purchase of stock in such a case is no less significant than in a case of direct reliance on misrepresentations.

*Basic*, 485 U.S. at 241-242.

The Court in *Basic* determined that "[r]equiring proof of individualized reliance from each member of the proposed class effectively would have prevented respondents from proceeding with a class action, since individual issues then would have overwhelmed the common ones." *Id.* at 242. However, the Court held that through the fraud-on-market theory, the application of a rebuttable presumption of reliance would overcome this barrier. *In re PS Group Inc., Sec. Litig.*, Nos. 93-2046,

92-2183, 92-2384, 92-2385, 92-2386, 1993 WL 477926, at *2 (C.D. Ill. Aug. 6, 1993) (citing *Basic*, 485 U.S. at 247).  "In practice, this presumption is very difficult to rebut."  *Friedland v. Coastal Healthcare Group*, Nos. 95-306, 95-310, 95-323, 95-324, 1996 U.S. Dist. LEXIS 16088, at *12 (M.D.N.C. Sept. 12, 1996).

It is well established that where a plaintiff alleges a fraud-on-the-market theory, the reliance of individual class members is not an issue.  *See Makor*, 256 F.R.D. at 595 (finding that common issues predominate over individual issues and holding that "[b]ecause [plaintiffs] are entitled to a presumption of reliance, individual issues of reliance can not predominate over the numerous common issues."); *see also Motorola*, 259 F.R.D. at 174 (finding that common issues predominate over individual issues and holding that "class members need not prove reliance on an individualized basis — class reliance will be presumed — 'if plaintiffs can show that the alleged misrepresentation was material and publicly transmitted into a well-developed market.'").

If members of a proposed class were individually required to establish the reasonableness of his or her reliance on the market price of a particular security, this would be as "crippling to efficient class action litigation as requiring members of a proposed class to establish individual reliance on specific misrepresentations."  *In re BearingPoint, Inc. Sec. Litig.*, 232 F.R.D. 534, 542 (E.D. Va. 2006).  Moreover, "most courts have held that a requirement that the issue of reliance must be individually proved will not prevent the certification of a class action, since to rule otherwise would preclude class actions in securities fraud cases and hamper enforcement of the federal securities laws."  Herbert B. Newberg, *Newberg on Class Actions* §22.46 at 94 (2d ed. 1985).

### a.    Plaintiffs Have Established Their Entitlement to Utilize the Fraud-on-the-Market Theory

In order to gain the benefit of the presumption of reliance under the fraud-on-the-market theory, a plaintiff must establish: "(1) that the defendant made public misrepresentations; (2) that the misrepresentations were material; (3) that the shares were traded on an efficient market; (4) that the

misrepresentations would induce a reasonable, relying investor to misjudge the value of the shares; and (5) that the plaintiff traded the shares between the time the misrepresentations were made and the time before the truth was revealed." *Basic*, 485 U.S. at 248 n.27.[15]

Plaintiffs have satisfied these elements and are thus entitled to a presumption of reliance. First, the Court has already found that Plaintiffs have alleged that Defendants made numerous public misrepresentations and that, at this stage in the litigation, the misrepresentations were material. *See* December Order at 7-10, 12-13.

Second, TOMO's shares were traded in an efficient market during the Class Period. Indeed, numerous courts have concluded that a stock's inclusion on a national exchange is a strong indicator of market efficiency. *See, e.g.*, *Accredo*, 2006 U.S. Dist. LEXIS 97621; *In re DVI Inc. Sec. Litig.*, 249 F.R.D. 196, 208-09 (E.D. Pa. 2008) ("*DVI*"); *In re PolyMedica Corp. Sec. Litig.*, 453 F. Supp. 2d 260, 266 (D. Mass. 2006) ("*PolyMedica I*"); *Wagner v. Barrick Gold Corp.*, 251 F.R.D. 112, 119-120 (S.D.N.Y. 2008); *see also Unger v. Amedisys Inc.*, 401 F.3d 316, 322 (5th Cir. 2005) (rejecting market efficiency where subject stock traded on the "less-organized" NASDAQ OTC Bulletin Board, but noting that "[i]n many cases, where heavily-traded or well known stocks are the target of suits, market efficiency will not even be an issue."). Here, the fact that TOMO was traded on the NASDAQ throughout the Class Period is strong evidence that the market for its common stock was efficient during the Class Period. *See In re HealthSouth Corp. Sec. Litig.*, 257 F.R.D. 260, 281 (N.D. Ala. 2009) (certifying a class and noting that "at a minimum, there should be a presumption – probably conditional for class determination – that certain markets are developed and efficient for

---

[15]   The Court has already sustained Plaintiffs' fraud-on-the-market allegations (¶¶189-194), which satisfy the reliance requirement of Section 10(b), by sustaining Plaintiffs' Section 10(b) claim with respect to Defendants' conversion cycle statements.

virtually all the securities traded there: The New York and American Stock Exchanges, the Chicago

Board Options Exchange and the NASDAQ National Market System").

In addition, "Market Capitalization . . . may be an indicator of market efficiency because

there is a greater incentive for stock purchasers to invest in more highly capitalized corporations."

*DVI*, 249 F.R.D. at 212. This factor is met here because, during the Class Period, TOMO's average

market capitalization was $990,180,411, which exceeded the NASDAQ average market

capitalization for 2008 of $811,769,759.[16] Likewise, public float, which is the percentage of

securities held by non-company insiders, is also "a relevant indicator of market efficiency." *Id.* In

this case, TOMO's public float was 40,871,797 or 81.61% of total shares outstanding as of February

29, 2008.[17] Thus, this factor supports market efficiency during the Class Period.

Moreover, TOMO's stock satisfies many of the factors of market efficiency identified in

*Cammer v. Bloom*, 711 F. Supp. 1264, 1286-87 (D.N.J. 1989). The *Cammer* factors, which are used

to determine whether a market is efficient enough to apply the fraud-on-the-market theory, include:

"(1) whether the stock trades at a high weekly volume; (2) whether securities analysts report on the

stock; (3) whether the stock has market makers and arbitrageurs; (4) whether the company is eligible

to file SEC registration form S-3, as opposed to Form S-1 or S-2; and (5) whether there are empirical

facts showing a causal relationship between unexpected corporate events or public releases and a

---

[16]    TOMO's average market capitalization was calculated by multiplying shares outstanding as of February 29, 2008 by the weekly share price for each week during the Class Period, which yields the weekly market capitalization. The average of the weekly market capitalization provides the average Class Period market capitalization for TOMO. *See* Exhibit A. The NASDAQ average market capitalization was calculated by dividing the 2008 NASDAQ market capitalization by the number of listed companies on NASDAQ during 2008. *See* World Federation of Exchanges, http://www.world-exchanges.org/statistics/annual/2008/equity-markets-0 (last visited on Dec. 30, 2009).

[17]    TOMO's public float was calculated by subtracting insider holdings and non-actively traded shares held by controlling shareholders from total shares outstanding. *See* Exhibit A and TOMO's DEF 14-A filed on March 19, 2008, attached hereto as **Exhibit G**.

subsequent response in the stock price." *Schleicher*, 2009 U.S. Dist. LEXIS 24810, at *13-*14 (citing *Cammer*, 711 F. Supp. at 1286-87).

While the Seventh Circuit has not expressly adopted the *Cammer* factors, they have been widely considered in other circuits. *Schleicher*, 2009 U.S. Dist. LEXIS 24810, at *14. *See, e.g.*, *Gariety v. Grant Thornton, LLP*, 368 F.3d 356, 368 (4th Cir. 2004), *cert denied*, 129 S. Ct. 652 (2008); *In re PolyMedica Corp. Sec. Litig.*, 432 F.3d 1, 4 (1st Cir. 2005) ("*PolyMedica II*"); *Lehocky v. Tidel Techs., Inc.*, 220 F.R.D. 491 (S.D. Tex. 2004) ("*Lehocky*"); *PolyMedica I*, 453 F. Supp. 2d at 266; *In re Xcelera.com Sec. Litig.*, 430 F.3d 503, 511 (1st Cir. 2005) ("*Xcelera.com*") ("'persuasive and widely followed' factors enumerated in *Cammer*."); *Accredo*,  2006 U.S. Dist. LEXIS 97621; *DVI*, 249 F.R.D. at 207-213; *Wagner*, 251 F.R.D. at 119-120.

Applying these well-developed and accepted factors to the present facts demonstrates the market efficiency for TOMO stock during the Class Period.[18]  For example, under *Cammer*, high weekly trading volume is indicative of market efficiency because "many investors are executing trades on the basis of newly available or disseminated corporate information."  *Cammer*, 711 F. Supp. at 1286.  Indeed, it is one of the most important factors.  *Krogman v. Sterritt*, 202 F.R.D. 467, 474 (N.D. Tex. 2001).  There is a "substantial presumption" of efficiency where **weekly** trading volume exceeds 1% of total shares outstanding and a "strong presumption" at 2%.  *Cammer*, 711 F. Supp. at 1286.  Here, TOMO's average weekly trading volume during the Class Period was

---

[18]     At this stage of the litigation, and as noted above, the Court is not required to resolve the merits of the case.  *See, e.g.*, *Gariety*, 368 F.3d at 366; *Accredo*, 2006 U.S. Dist. LEXIS 97621 at *11 (collecting cases); *PolyMedica II*, 432 F.3d at 17; *DVI*, 249 F.R.D. at 200 ("'[A]t the class certification stage, the Court need not concern itself with whether Lead Plaintiffs can prove their allegations . . . the Court need only assure itself that Lead Plaintiffs' attempt to prove their allegations will predominately involve common issues of fact and law.'"); *Lehocky*, 220 F.R.D. at 505, n.16 ("[a]t [the class certification] stage . . . the Court need only inquire whether the stock traded in an efficient market and not examine the merits of the case . . . .  Thus, the Court will not address whether Defendants' [sic] can rebut the presumption of reliance.").

2,108,237 or 4.21% of total shares outstanding.[19] Thus, under *Cammer*, TOMO's weekly average trading volume supports a strong presumption of market efficiency.

Moreover, under *Cammer*, it is "persuasive to allege a significant number of securities analysts followed and reported on a company's stock during the class period." *Cammer*, 711 F. Supp. at 1286. Indeed, "the greater the number of securities analysts following and reporting on a company's stock, the greater the likelihood that information released by a company is being relied upon by investors." *Xcelera.com*, 430 F.3d at 514; *see also PolyMedica I*, 453 F. Supp. 2d at 267. During the Class Period, at least *19* separate analysts followed TOMO stock, evidencing that the market for TOMO's common stock was efficient.[20]

In addition, the existence of market makers and arbitrageurs for a stock demonstrates market efficiency. *See Cammer*, 711 F. Supp. at 1286-87. "The existence of market makers and arbitrageurs would ensure completion of the market mechanism; these individuals would react swiftly to company news and reported financial results by buying or selling stock and driving it to a changed price level." *Id.*[21] During the Class Period, market makers and arbitrageurs existed in TOMO stock. For example, Craig Hallum Capital Group LLC, Jeffries & Company, Inc., William

---

[19]    TOMO's average weekly trading volume during the Class Period as a percentage of total shares outstanding was calculated by dividing the average weekly trading volume during the Class Period by the total shares outstanding. *See* Exhibit A and Bloomberg's Historical Pricing Function for TOMO, attached hereto as **Exhibit H**.

[20]    For instance, TOMO was followed by analysts from Merrill Lynch, Thomas Weisel Partners, William Blair & Co., Jeffries & Co., Inc., Robert W. Baird, Soleil Securities, Nutmeg Securities, Piper Jaffray, Leerink Swan, Citigroup, JP Morgan, Craig-Hallum Capital Group LLC, Apothecary Capital, CIBC World Markets, Stark Investments, Oppenheimer, Next Generation Equity Research, LLC, Global Markets Direct, and The Investext Group.

[21]    "A market-maker is '[o]ne who helps establish a market for securities by reporting bid-and-asked quotations' (the price a buyer will pay for a security and the price a seller will sell a security)." *Xcelera.com*, 430 F.3d at 515.

Blair & Company, and CBIC World Markets made a market in TOMO securities during the Class Period.[22]

Likewise, where a significant percentage of a company's stock is held by large institutional investors, this indicates that the market for that stock was open and efficient. *See Tatz*, 2003 WL 21372471, at *7 (in applying the *Cammer* factors, finding the market for Nanophase's stock open and efficient where, *inter alia*, 11% to 13% of the company's total outstanding common stock "was held by numerous large institutional investors during the Class Period, including mutual funds, insurance companies, pension plans, banks, and other professional investors who manage equity portfolios in excess of $100 million"). Here, as of June 30, 2007, approximately 24% of TOMO's common stock was held by institutional shareholders. This increased to 59.46% as of March 31, 2008. Thus, the fact that a significant percentage of TOMO shares was held by sophisticated institutional investors supports the efficiency of the market for TOMO stock during the Class Period.[23]

In sum, the market for TOMO stock during the Class Period was efficient and appropriately gives rise to a presumption of reliance sufficient to meet the predominance element of Rule 23(b)(3).

Finally, it is evident that Plaintiffs purchased their TOMO shares after the misrepresentations were made and before the truth was revealed. The Class Period for this action began on May 9,

---

[22]     *See* October 31, 2007 analyst report of Craig Hallum Capital Group LLC at 5, March 7, 2008 analyst report of Jeffries & Company, Inc. at 17, December 5, 2007 analyst report of William Blair & Company at 16, and October 31, 2007 analyst report of CIBC World Markets at 6, attached hereto as **Composite Exhibit I**.

[23]     The percentage of TOMO common stock held by institutional investors was calculated by dividing the total 13F holdings for TOMO by TOMO's total shares outstanding. *See* Exhibit A and 13F Historical Momentum Report for TOMO, attached hereto as **Exhibit J**.

2007.  According to Plaintiffs' certifications, they purchased TOMO shares well within the period after misrepresentations were made and before the truth was revealed.[24]  ¶166.

### 3.     A Class Action is Superior to Other Available Methods for the Fair and Efficient Adjudication of this Action

To determine whether the "superiority" requirement of Rule 23(b)(3) is satisfied, the Court must consider the following:

1.     the interest of members of the Class in individually controlling the prosecution of separate actions;

2.     the extent and nature of any litigation concerning the controversy already commenced by members of the Class;

3.     the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and

4.     the difficulties likely to be encountered in the management of a class action.

*See* Fed. R. Civ. P. 23(b)(3)(A)-(D).

Each of these factors weighs strongly in favor of class certification here.  Where, as here, there is a "common core of law and fact pertaining to Defendants' alleged misrepresentations and omissions . . . class treatment is a more efficient means of adjudicating this matter than the myriad individual suits that potentially could be filed in the absence of certification."  *Bank One*, 2002 U.S. Dist. LEXIS 8709, at *23.

In this action, the interest of members of the Class in individually controlling the prosecution of separate actions is minimal.  Indeed, "class members will benefit from class treatment because litigation costs are high and it is, therefore, unlikely shareholders will prosecute individual claims."  *Tatz*, 2003 WL 2137241, at *10.  *See also Hartmarx*, 2002 WL 31103491, at *18 (noting that an individual action "may be cost prohibitive for many investors."); *Neopharm*, 225 F.R.D. at 568

---

[24]     *See* **Composite Exhibit D**.

(noting that many "investors are likely to also have relatively small claims making it expensive to seek recovery through individual litigation."). Moreover, "a class action is a superior means to adjudicate claims of class members who would be overwhelmed by Defendants' resources if they chose to prosecute their individual claims." *Tatz*, 2003 WL 2137241, at \*10. Indeed, the costs and expenses of such individual actions would be prohibitive when weighed against the potential individual recoveries. *Neopharm*, 225 F.R.D. at 568 ("As with many securities law cases, this case involves a large number of investors who are likely to be geographically dispersed. Many of these investors are also likely to have relatively small claims making it expensive to seek recovery through individual litigation.").

Moreover, the burden on the courts from adjudicating separate actions that arise out of the same facts would be significant. *See Tatz*, 2003 WL 2137241, at \*10 ("principles of judicial economy and efficiency favor trying this case in one action rather than forcing class members to litigate identical claims individually."). Indeed, "class certification is the best way to manage this situation which could otherwise disintegrate into piecemeal adjudication of many individual actions involving essentially identical questions of law and fact." *Id.* Thus, with respect to the first two factors, all relevant considerations weigh in favor of class certification.[25] *See* Fed. R. Civ. P. 23(b)(3)(A)-(B).

Courts have uniformly recognized that the class action is superior to other available methods – particularly duplicative individual lawsuits – for the fair and efficient resolution of large-scale securities fraud actions. The Supreme Court has recognized that "[c]lass actions . . . permit the

---

[25]    As for Rule 23(b)(3)(C), TOMO's principal place of business is located in this District, and the Company transacted substantial business here. ¶22. Much of the conduct complained of occurred in this District, and much of the evidence and many of the witnesses relevant to Plaintiffs' claims are located here. This forum, therefore, is the most desirable in which to prosecute this action.

plaintiffs to pool claims which would be uneconomical to litigate individually . . . . [M]ost of the

plaintiffs would have no realistic day in court if a class action were not available." *Phillips*

*Petroleum Co. v. Shutts*, 472 U.S. 797, 809 (1985).  Moreover, the Supreme Court explained:

> "The policy at the very core of the class action mechanism is to overcome the
> problem that small recoveries do not provide the incentive for any individual to bring
> a solo action prosecuting his or her rights.  A class action solves this problem by
> aggregating the relatively paltry potential recoveries into something worth someone's
> (usually an attorney's) labor."

*Amchem Prods. v. Windsor*, 521 U.S. 591, 617 (1997) (quoting *Mace v. Van Ru Credit Corp.*, 109

F.3d 338, 344 (7th Cir. 1997)).

District courts within the Seventh Circuit have similarly commended class actions as superior

to other methods of adjudication of claims under the federal securities laws, and have found such

claims particularly suitable to class treatment given the large number of potential plaintiffs and the

likelihood that individual claims would often be too small to warrant individual suits.  *See Tatz*, 2003

WL 21372471, at *9 (certifying a class because "class treatment is a more efficient means of

adjudicating this [securities fraud] matter than the myriad individual suits that potentially could be

filed in the absence of class certification"); *Neopharm*, 225 F.R.D. at 568 (noting that "[a]s with

many securities law cases. . . . [a] class action would be the most efficient use of judicial resources in

resolving the common issues alleged in this action."); *Van Kampen Funds*, 2002 WL 1989401, at *4

("securities cases often are particularly well-suited for class action procedures . . . [m]oreover,

pursuant to the PSLRA, all pending litigation on this issue has already been consolidated before this

court and the expense of the litigation might otherwise make it difficult for the plaintiffs to proceed

individually").

Finally, Plaintiffs do not foresee any management difficulties that will preclude this action

from being maintained as a class action.  There is no indication that this case will be any "more

difficult to manage as a class action than a typical securities fraud class action." *Cent. Cmty. Church*

*of God*, 2005 U.S. Dist. LEXIS 8679, at \*20.  A class action is not only superior, but perhaps the only feasible mechanism in which to efficiently litigate the claims alleged in this action.  *See, e.g., Phillips Petroleum*, 472 U.S. at 809 (class action mechanism allows plaintiffs to pool claims that would otherwise be uneconomical to litigate individually).  Indeed, "Rule 23 was designed for this exact type of case."  *Bank One*, 2002 U.S. Dist. LEXIS 8709, at \*24; *Tatz*, 2003 WL 21372471, at \*10.  Moreover, there is no reason to believe that Plaintiffs' attorneys, who have substantial experience in class action litigation in this and other districts, will encounter significant or unusual difficulties in the management of this litigation.

Consistent with the requirements of Rule 23(b)(3), the certification of this litigation as a class action would not only be "superior to other available methods for the fair and efficient adjudication of the controversy," but appears to be the sole method for fairly and efficiently litigating the claims of all members of the proposed Class.  Accordingly, the prosecution of this action as a class action will "achieve economies of time, effort and expense, and promote uniformity of decisions as to persons similarly situated."  *In re Dynegy, Inc. Sec. Litig.*, 226 F.R.D. 263, 282 (S.D. Tex. 2004).

## V.    Conclusion

For the foregoing reasons, Plaintiffs respectfully request that the Court grant Plaintiffs' Motion for Class Certification in its entirety.

DATED:  December 30, 2009                    ADEMI & O'REILLY, LLP
                                            GURI ADEMI
                                            SHPETIM ADEMI


                                            _____
                                                   /s/Shpetim Ademi
                                            SHPETIM ADEMI

                                            3620 East Layton Avenue
                                            Cudahy, WI  53110
                                            Telephone:  414/482-8000
                                            414/482-8001 (fax)

                                            **Liaison Counsel**

                                            COUGHLIN STOIA GELLER
                                              RUDMAN & ROBBINS LLP
                                            JACK REISE
                                            STEPHEN R. ASTLEY
                                            ELIZABETH A. SHONSON
                                            120 East Palmetto Park Road, Suite 500
                                            Boca Raton, FL  33432
                                            Telephone:  561/750-3000
                                            561/750-3364 (fax)

                                            LAW OFFICES BERNARD M. GROSS, P.C.
                                            DEBORAH R. GROSS
                                            ROBERT P. FRUTKIN
                                            100 Penn Square East, Suite 450
                                            Philadelphia, PA 19107
                                            Telephone:  215/561-3600
                                            215/561-3000 (fax)

                                            **Co-Lead Counsel for Plaintiffs**

                                            PASKOWITZ & ASSOCIATES
                                            LAURENCE D. PASKOWITZ
                                            60 East 42nd Street, 46th Floor
                                            New York, NY  10165
                                            Telephone:  212/685-0969
                                            212/683-2306 (fax)

                                            ROY JACOBS & ASSOCIATES
                                            ROY L. JACOBS
                                            60 East 42nd Street, 46th Floor
                                            New York, NY  10165
                                            Telephone:  212/867-1156
                                            212/504-8343 (fax)

                                            **Additional Counsel for Plaintiffs**